IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned On Briefs October 23, 2012

IN THE MATTER OF: DAKOTA C.R., ET AL.

Direct Appeal from the Juvenile Court for McNairy County
No. C-849     Van McMahan, Judge

No. W2012-00433-COA-R3-PT - Filed December 7, 2012

This is a termination of parental rights case, in which the trial court terminated Mother and Father's parental rights to three of their children on the grounds of severe abuse and persistence of conditions. We reverse the ground of severe abuse as to Father, affirm as to Mother, and affirm the ground of persistence of conditions as to both parents. We also affirm the trial court's finding that termination is in the best interests of the children. On that basis, we affirm the termination of Mother and Father's parental rights.

Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Juvenile Court Reversed in Part; Affirmed in Part; and Remanded

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Thomas E. Weakley, Dyersburg, Tennessee, for the appellants, Jimmy R. and Roseanna R.

Robert E. Cooper, Jr., Attorney General and Reporter; Bill Young, Solicitor General; Mary Byrd Ferrara, Assistant Attorney General, for appellee, State of Tennessee, Department of Children's Services.

OPINION

I. Background

Jimmy R. ("Father") and Roseanna R. ("Mother," and collectively, "Parents") are the parents of Dakota (d.o.b. 6/11/04), Jimmy, Jr. (d.o.b 3/5/06), and Nathaniel (d.o.b. 2/23/07).[1]

_____

[1] It is the policy of this court to use the initials of children and parties involved in juvenile court
(continued...)

The children at issue were subject to a prior dependency and neglect petition, which was appealed to this Court, *In re Dakota C.R.*, No. W2010-01946-COA-R3-JV, 2012 WL 1418048 (Tenn. Ct. App. April 24, 2012) (no perm. app. filed) (hereinafter "*In re Dakota I*"). Father's two older children, Cody and Seth, were previously removed from Mother and Father's custody based upon allegations of abuse and neglect.[2]

On October 31, 2007, Nathaniel, then eight months old, presented to the McNairy Regional Hospital ("Hospital") with a non-displaced skull fracture to the right frontal bone, extensive bruising, scratches, soft tissue swelling, and overlying scalp hematoma that reached from his forehead to the bridge of his nose. The hospital records noted possible abuse and that the injuries were suspicious for non-accidental trauma. Mother alleged that eighteen month old Jimmy, Jr. climbed into Nathaniel's crib while carrying a portable telephone and repeatedly hit his brother on the head. Mother and Father both insisted that Jimmy, Jr. had the strength, dexterity and motive to fracture Nathaniel's skull because he wanted to take Nathaniel's bottle away. The Hospital records indicate that the emergency room attendant found Nathaniel's injuries to be consistent with Mother's explanation.

As to how these events occurred, our prior opinion states:

> Mother claims that at approximately 11:00 P.M., while Father was at work, she took a shower, with the radio on "half-way[,]" while the children were sleeping-Nathaniel in a crib, Jimmy, Jr. on a sofa, and Dakota and Cody in a "back bedroom." After fifteen to twenty minutes, she exited the shower and heard eight-month-old Nathaniel "crying[] and screaming[.]" She claims that she saw eighteen-month-old Jimmy, Jr. in Nathaniel's crib "hitting [Nathaniel] in the head with the cordless phone." She retrieved Nathaniel and held him "trying to calm him down [,]" but he continued to scream. She also attempted to put both ice and a warm "washrag" on Nathaniel's head, but, according to Mother, "[h]e wouldn't be still. He kept moving."

*In re Dakota I*, 2012 WL 1418048, at *1 (footnote omitted). Because Mother did not have

[1](...continued)
actions to protect the privacy of the children involved.

[2] Mother is not the biological parent of Cody or Seth. Although unclear from the record, it appears that Father was allowed supervised visitation with Cody and Seth, but Mother was not allowed any visitation.

transportation, Mother called Father, who was at work, asking him to come home to drive her and Nathaniel to the hospital. Mother then waited for Father to arrive. Sometime after midnight, Mother and Father took Nathaniel to the Hospital.

The hospital performed a CT scan on Nathaniel. According to our prior opinion, the CT scan showed that:

> There is soft tissue swelling overlying the right frontal bone, and there is a nondisplaced fracture of the right frontal bone. No evidence of significant depression. There is no acute intracranial hemorrhage, mass effect, or midline shift. The basilar cisterns are patent. The gray-white matter differentiation appears preserved.

*In re Dakota I*, 2012 WL 1418048, at *1. Both the Department of Children's Services ("DCS," or "Appellee") and the McNairy County Sheriff's Department were alerted to the findings and an investigation ensued. Upon Nathaniel's release from the Hospital, DCS removed Dakota, Jimmy, Jr., and Nathaniel from the home. The children were first placed in a foster home and were later moved to the home of a friend of Mother's, Eleanor Fowler. However, on June 16, 2009, all three children were moved to the home of Joyce Johnson. Ms. Johnson is the adoptive mother of Mother and the children's maternal grandmother.[3] The children remained at the home of Ms. Johnson at time of the trial in this case.[4]

According to our prior opinion:

> [A] Petition to Adjudicate Dependency and Neglect was filed against Mother and Father in the McNairy County Juvenile Court, regarding Dakota, Jimmy, Jr., and Nathaniel, on November 6, 2007, and a guardian ad litem was appointed to represent their interests. On December 9, 2008, the juvenile court adjudicated the three children dependent and neglected, and it found that both Mother and Father had severely abused Nathaniel. Mother and Father appealed these findings to the

---

[3] From what we can glean from the record, Ms. Johnson has no meaningful relationship with Mother. Indeed, Ms. Johnson only agreed to take the children once she was assured that DCS was attempting to terminate Mother and Father's parental rights.

[4] We note that Ms. Johnson filed an intervening petition for custody in the Juvenile Court on June 30, 2011. The petition was dismissed, without prejudice to refile, on June 1, 2012.

McNairy County Circuit Court, and a trial was held on June 7
and June 21, 2010.

*In re Dakota I*, 2012 WL 1418048, at *1. The juvenile court held that all three children were dependent and neglected. Further, the trial court ruled that Nathaniel was the victim of severe abuse at the hands of both Mother and Father. Mother and Father appealed to this Court. This Court affirmed the dependency and neglect findings, as well as the severe abuse finding as to Mother, but reversed the severe abuse finding as to Father, concluding that Father was not home at the time of the abuse and other evidence was inconclusive as to whether Father knew that Mother had a disposition toward physical abuse of the children. *See In re Dakota I*, 2012 WL 1418048, at *11.

Prior to the ruling in the first appeal, on September 10, 2010, DCS filed a petition to terminate both Mother and Father's parental rights as to all three children on the grounds of persistence of conditions and severe abuse. The trial court held a hearing on the petition to terminate Mother and Father's parental rights as to Dakota, Jimmy, Jr., and Nathaniel on April 11, 2011, and August 9, 2011. During the pendency of the case, Mother and Father had another child, Michael (d.o.b. 1/22/2011). Michael was removed from Parents' home on February 25, 2011.

At trial, DCS case worker Maria Mullins first testified that Father's two oldest children, Cody and Seth, were previously removed from the home due to allegations of physical abuse and excessive discipline. Ms. Mullins testified that, when she visited the children at their foster family, Dakota showed Ms. Mullins a scar, which the child stated was caused when Father had spanked her with a belt. The scar was about two-and-a-half inches long. Also, Dakota had marks on her back, which she stated were caused by Mother, who had allegedly "switched" her. When Ms. Mullins asked Mother and Father about these marks, they explained that their children play rough.

DCS personnel also testified about Mother and Father's refusal to take responsibility for injuries to their children and refusal to work with DCS toward reunification. Ms. Mullins testified that neither Mother nor Father took any responsibility for Nathaniel's injuries. Indeed, Mother and Father chose to blame Jimmy, Jr., who Mother referred to as a "demon child." Ms. Mullins testified that Mother and Father had previously refused to take responsibility for Cody and Seth's injuries, instead choosing to blame each child for the injuries of the other child. Mother and Father also refused to take part in parenting classes, counseling and anger management, stating that they had done nothing wrong and pointing out that they had previously participated in parenting classes when Cody and Seth were removed from the home. Specifically, when Mother and Father were told that the children would be removed and that they would need to take certain steps in order to be reunified,

Mother "got mad and started screaming, yelling, and cursing and left the DCS office." Father, however, remained at the office.

Also, during the investigation into Nathaniel's injuries, DCS learned that Cody, one of the children removed from the home in a prior proceeding, was living with Parents, in clear violation of the court's prior order. According to Ms. Mullins, neither Mother nor Father seemed concerned about violating the prior order; instead, after explaining that Cody was not allowed to live with them, Ms. Mullins described Parents' reaction as "nonchalant." Further, when DCS was attempting to avoid placing the children in foster case and was endeavoring to place the children with relatives, Mother and Father initially refused to give the names of any relatives with whom the children might live. In fact, Ms. Mullins testified that Mother and Father "absolutely refused" to sign any paperwork "whatsoever," regarding the children, and further refused to give DCS information concerning whether the children had allergies or other medical issues. In addition, Ms. Mullins testified that Mother and Father refused to bring Cody's medicine, which was "something he desperately needed to have," to DCS, although the medication was in Parents' possession.

Shannon Turner, a family service case worker with DCS, testified about the services provided to Mother and Father after the children were removed in an effort to return the children to their custody. Ms. Turner testified that DCS offered therapeutic supervised visitation sessions, parenting classes, and other services to Mother and Father, but that they generally declined these services. According to Ms. Turner, Mother and Father stated that they had previously participated in these types of services when Cody and Seth were removed, but that "during this matter, they said they did nothing wrong, and they didn't need services." Ms. Turner verified that Mother and Father had previously participated in parenting classes and intensive family preservation services after Cody and Seth were removed from the home. Describing Mother and Father's demeanor throughout DCS' involvement with the current case, however, Ms. Turner stated:

> It was just a very volatile, I guess, situation at times, you know, where we would try to offer services and there was a lot of conflict between the parents and the foster parents and during visitation, there were lots of different allegations made and threats made 'cause I think at one point, even a restraining order had to be filed to keep them away from the foster parents and my supervisor because of some threats that had been made. I don't recall the exact threats. I'd have to see the order, but I don't — I don't remember exactly, but it was just a — a very volatile situation, which anytime you're dealing with, you know, a parent's children, it can be volatile, but often times we're able to

-5-

work with — with parents and — and — and offer services and they're very accepting.

However, Ms. Turner did testify that Mother and Father eventually provided her with the names of two relatives for possible placement of the children. Indeed, the children were later placed with an "old family friend" recommended by Mother.

In addition, Ms. Turner testified that Mother and Father did participate in a LeBonheur Center for Children and Parents Evaluation. DCS submitted a report from the LeBonheur Center for Children and Parents ("the Center"), which recommended that the children not be returned to Mother and Father. After evaluating the family, the Center concluded that, because Mother and Father had already received a multitude of services from DCS in an effort to reunify them with their children and none of those services had any meaningful effect, Mother and Father were unlikely to make any meaningful changes in the future. In addition, the Center reported that "any child placed in the care of [Mother and Father] should be considered at an immediate risk of physical harm."

Ms. Turner was also concerned about Mother and Father's continued refusal to take any responsibility for Nathaniel's injuries, stating:

> [I]n working with the parents they continue to deny any wrongdoing, which, you know, I don't expect the parents to just say, oh, I've -- I've done this, but even, you know, even with the — the statement of — that the younger child had done it, there was concerns about the lack of supervision in the home if — if the child did it, and they knew he was capable of that because in fact even in one of the child and family team meetings, they referred to him as their demon child and so even with — that was a big concern because even — even if that was — if that's exactly what happened, there was concern that they needed help just to be able to supervise the children and, again, they — they never admitted any sort of wrongdoing.

Ms. Turner further explained that, after receiving the recommendation from the Center, DCS changed the desired outcome of the case from reunification to placement with a family member or adoption.

Finally, Misty Ballard, the most recent DCS case worker for the children, testified on behalf of DCS regarding her involvement in the case. Ms. Ballard, who holds a Masters Degree in Mental Health Counseling, testified that she was not a part of the prior proceedings

to remove Cody and Seth from Mother and Father's home and that she attempted to provide Mother and Father a "clean start" when she took over the case. Ms. Ballard testified the DCS case file showed that Mother had been diagnosed with past "mental health issues" and had previously been admitted to a mental health facility. However, Ms. Ballard testified that Mother was not in counseling or taking her prescribed medications during the period at issue in this case. According to Ms. Ballard, when she met with Mother and Father, she asked Mother about participating in mental health counseling, but Mother stated that she wanted nothing from DCS but her children back. Describing what she viewed as the barrier to the children returning home, Ms. Ballard stated:

> They've never t[aken] any responsibility for anything. It's always -- blamed it on another child and then they blame the next one on the next child and it -- it just continued. It was the same pattern. They still say, you know, they did nothing wrong. You don't get this many children hurt and there not be a problem. Of course, and then the mental health concerns because if people with true mental illness are not on their medications, they can be very aggressive. They can be homicidal/suicidal.

> \* \* \*

> So, then, you know, that kind of — that bothered me because no one would take responsibility. It — it was always being blamed on the court system or the DCS worker, you know, before me or, you know, the Sheriff's Department. It was — there was never any type of remorse. There was nothing. Very flat affect.

> \* \* \*

> No emotion, almost. I mean, just everything was just really flat.

Ms. Ballard also testified concerning the efforts DCS had taken with regard to the children after they were removed from Mother and Father's custody:

> The children, actually Dakota was — once she moved to Ms. Fowler's house, and I took over, she started going to counseling with a play therapist in Covington, Tennessee. She did that. Nat[haniel] and Jimmy[, Jr.], we had them re-evaluated, and they were developmentally delayed some. So, they both started speech therapy. Jimmy[, Jr.] started getting his through the— the

-7-

school system because he was at that age and then Nat[haniel], we had to take him to Brownsville to get his.

When questioned about whether DCS continued supervised visitation with Mother and Father at the time of the trial, Ms. Ballard explained:

No, visitation came to a halt on [January 9, 2009].

\* \* \*

. . . . I asked that visitation be stopped due to the problems it was causing for the children. The children were being physically sick. They were being fed candy, cokes, all that, and then they would go home and be physically throwing up. Their behavior was very bad when they got home. They wouldn't listen. They wouldn't mind. It continued to be a problem. . . . [Parents] would bring people that were not supposed to be at the visit to the visit. One time [Mother] brought her brother to a visit and he does not have his — custody of his children. So, that was a concern. The [paternal] grandmother would show up at the visit and, you know, that was not allowed. We put in a supervised visitation person, trying to keep the family because Ms. Eleanor [Fowler] was trying to do the visits at one time, and they would take Dakota off in — in the truck and talk to her. They would take her to the bathroom and talk to her, and they just were not able to — to supervise them. They–they would come over and stay for long periods of time.

After visitation stopped, Ms. Ballard stated that the permanency plan was modified to reflect that the desired outcome was solely adoption. When Mother and Father were presented with the new plan, however, they refused to sign the form acknowledging that they had received the plan. Nonetheless, this permanency plan was ratified by the trial court on April 7, 2009.

Finally, Ms. Ballard testified that, if Mother and Father's parental rights are terminated, then the children's foster mother, Ms. Johnson, hopes to adopt the children. Describing the children's relationship with Ms. Johnson, Ms. Ballard stated:

It's a wonderful relationship. They are very bonded to her. Matter of fact, Nat[haniel], I mean, just stays right on top of her all the time. But the children are doing well. Dakota got released

-8-

from counseling now. She doesn't have to go anymore. Jimmy and Nat[haniel] are both attending Head Start, and they're actually in the — they are in the same class together. Dakota's doing very well in school, not having any behavior problems. She's getting smiley faces. So, the children are doing really well.

Ms. Ballard also testified that there were no safety concerns in the foster home and that Ms. Johnson only agreed to take the children once it was clear that Mother and Father's parental rights were likely to be terminated because she was "afraid" of Mother and Father.

The deposition testimony of Dr. Karen Lakin, a specialist in pediatric child abuse, was admitted as an exhibit at the trial of this matter. Dr. Lakin examined the children on December 10, 2007, after they were taken into DCS custody. In her deposition, Dr. Lakin testified that the force necessary to cause Nathaniel's injuries was likely to cause great bodily harm or death. Further, Dr. Lakin testified that Mother and Father's explanation was not consistent with Nathaniel's history, as he had no conditions that would cause him to be predisposed to fractures. Dr. Lakin also testified that Jimmy, Jr. did not have the strength and capacity to climb into Nathaniel's crib, holding the portable phone and striking with enough force to cause the injuries that Nathaniel had sustained. Dr. Lakin also testified to numerous healing fractures found on Jimmy, Jr. Dr. Lakin testified that these injuries were likely the result of non-accidental trauma and that he had never received proper medical treatment for these injuries. However, Dr. Lakin was unable to determine definitively whether the injuries occurred while Jimmy, Jr. was in Parents' custody, or while he was in the custody of the first foster family.

Father and Mother testified on their own behalf at the termination hearing. Both Mother and Father denied ever having physically abused any of their children. Father testified that, when Seth and Cody were removed from the home, DCS recommended that he and Mother take parenting class and home counseling and they complied. However, the children were not returned to Mother and Father. Father testified that he and Mother had been complying with DCS' requests with regard to their youngest son Michael and were now willing to comply with DCS' recommendations regarding the children at issue in this case. Father admitted that the children had formed a close bond with Ms. Johnson, their foster mother, but stated that it would be in the children's best interests to be returned to him and Mother because he would "like to have his children back." Father further testified that he was not home at the time of Nathaniel's injuries and that he did not believe that Mother had caused the injuries, despite the strong evidence that she did. Father testified that he had never witnessed Mother use excessive force on the children and stated that he believed Mother's explanation of what occurred because the emergency room physician stated that the story was consistent with Nathaniel's injuries. Father testified that, if custody was returned to him, he

would "watch over them more carefully . . . make sure they're safe;" this despite his contention that neither he nor Mother had ever done anything wrong.

Mother next maintained that, although she was the only adult present at the time, she did not injure Nathaniel on October 31, 2007 or on any other occasion. Mother testified that Jimmy, Jr. was particularly adept at climbing and she believed he would have been able to crawl into Nathaniel's crib and injure him. Mother further testified that she did not have a habit of losing her temper and injuring the children. In fact, Mother testified that, while she had been indicted for child abuse in connection with Nathaniel's injuries, a McNairy County jury had found her not guilty of aggravated child abuse. Like Father, Mother also testified that she had complied with all of DCS' requests regarding the youngest child Michael, and that she was willing to comply with future DCS requests regarding the children at issue, should those children be returned to her. Mother further testified that DCS had offered her no services other than services previously offered when Seth and Cody were removed. When asked whether Mother would change her parenting style if the children were returned to her, Mother replied, "I haven't done nothing wrong." Mother admitted, however, that she had previously whipped her children with a small belt, a fly swatter, and a small paint paddle.

On January 23, 2012, the trial court entered an order terminating Mother and Father's parental rights to Dakota, Jimmy, Jr., and Nathaniel. The trial court specifically found that Mother was not a credible witness, but found that Dr. Lakin's testimony to be "credible [and] trustworthy." As grounds for termination of the Parents' rights, the trial court found clear and convincing evidence to support two grounds: (1) severe abuse with regard to the injuries sustained by both Nathaniel and Jimmy, Jr.; and (2) persistence of conditions. The court further found that termination of Parents' rights was in the children's best interest because "the parents have not made an adjustment of circumstances, conduct or conditions as to make it safe and in the children's best interest to be in the home of the parent." However, the trial court later restored custody of Michael to Mother and Father, effective February 13, 2012. Mother and Father filed their notice of appeal on February 16, 2012.

## II. Issues Presented

1.      Whether there is clear and convincing evidence to support the trial court's finding that grounds exist for termination?
2.      Whether there is clear and convincing evidence that the termination is in the children's best interest?

## III.  Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental

right to the care, custody, and control of his or her child. ***Stanley v. Illinois***, 405 U.S. 645, 651 (1972); ***Nash-Putnam v. McCloud***, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. ***Nash-Putnam***, 921 S.W.2d at 174–75 (citing ***Santosky v. Kramer***, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. ***Santosky***, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id***. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002). When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See* ***McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See id.*; *see also* ***Walton v. Young***, 950 S.W.2d 956, 959 (Tenn.1997).

## III. Grounds for Termination

The trial court found two grounds for termination of both Mother and Father's parental rights. Only one ground must be proved by clear and convincing evidence to justify termination of parental rights. Tenn. Code Ann. § 36-1-113(c). We will consider each ground in turn.

### A. Severe Child Abuse, Tennessee Code Annotated Section 36-1-113(g)(4)

In Tennessee, a court may terminate parental rights when:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian.

Tenn. Code Ann. § 36-1-113(g)(4). "Severe child abuse" is defined, in relevant part, as:

> The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death.

Tenn. Code Ann. §37-1-102(b)(23)(A)(i). If a court finds that a parent has committed severe child abuse under this section, this finding establishes the showing of "substantial harm" required under ***In re Askew***, 993 S.W.2d 1, 4 (Tenn. 1999), which allows the State to keep custody of the child. *See, e.g., **Dept. of Children's Serv's v. L. S.**,* No. M1999-00847-COA-R3-CV, 2000 WL 1425234 (Tenn. Ct. App. Sept. 28, 2000) (stating that a finding of abuse or severe child abuse establishes substantial harm). In addition, a finding of severe abuse as to one child in the home excuses DCS from making "reasonable efforts" to reunify the child and its siblings or half-sibling with that parent. According to Tennessee Code Annotated Section 37-1-166 :

> Reasonable efforts . . . . shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that:

(A) The parent has subjected the child that is the subject of the petition or any sibling or half-sibling of the child who is the subject of the petition or any other child residing temporarily or permanently in the home to aggravated circumstances as defined in § 36-1-102.

Severe child abuse is among the types of aggravated circumstances defined in Tennessee Code Annotated 36-1-102. Accordingly, if there is a finding of severe abuse as to a parent, DCS is not required to make reasonable efforts toward reunification with that parent.

As previously discussed, the trial court found that both Mother and Father committed severe abuse during the dependency and neglect stage of this litigation and relied on that finding to constitute a ground to terminate both Parents' rights. This Court affirmed the severe abuse finding as to Mother on April 24, 2012 and Mother did not appeal that decision. A mandate was issued on July 3, 2012. Thus, the order finding that Mother had committed severe child abuse became a final, non-appealable judgment on July 3, 2012.

The doctrine of *res judicata* applies when "an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." ***Galbreath v. Harris***, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990). This court previously applied the doctrine of *res judicata* to prevent a parent from re-litigating whether she committed severe child abuse in a later termination of parental rights proceeding, when such a finding had been made in a previous dependency and neglect action. *See* ***State v. Tate***, No. 01-A-01-9409-CV-00444, 1995 WL 138858, at *5 (Tenn. Ct. App. Mar. 31, 1995). Mother and DCS were among the parties in the dependency and neglect action and the issue of whether Mother committed severe child abuse was fully litigated. Therefore, the issue of whether Mother committed severe child abuse is *res judicata* and the trial court properly found this ground by clear and convincing evidence.

In her brief, however, Mother argues that the Court erred in relying on the dependency and neglect finding of severe abuse because new evidence was available at the termination hearing that was not available at the dependency and neglect hearing in Juvenile Court: that Mother was found not guilty of criminal child abuse charges in a jury trial in McNairy County. Respectfully, the fact that a jury failed to conclude that Mother committed criminal aggravated child abuse beyond a reasonable doubt is not fatal to the trial court's finding that Mother committed severe child abuse based on clear and convincing evidence. *See* ***In re B.G.J.***, No. E2003-02475-COA-R3-PT, 2004 WL 1906446, at*7 (Tenn. Ct. App. Aug. 26, 2004) (holding that criminal charges need not be sustained in order to find a parent

committed severe abuse). Further, according to Mother's testimony, she was acquitted of the criminal charges on July 6, 2009. The Circuit Court, in a *de novo* appeal from Juvenile Court, found that Mother committed severe child abuse after a trial in June 2010. Consequently, the evidence regarding Mother's acquittal was known at the time of the trial in which Mother was deemed to have committed severe child abuse. This issue is, therefore, without merit. Accordingly, the trial court's finding, as to Mother, that the ground of severe abuse was proved by clear and convincing evidence is affirmed.

The trial court also relied on its earlier finding of severe abuse as a ground to terminate Father's rights. As previously discussed, this Court reversed the finding that Father had committed severe child abuse, stating:

> In this case, the trial court's finding of severe abuse was limited to Nathaniel's injuries sustained on October 30, 2007. However, the existence of prior abuse to any of the children could have imputed Father with liability for Nathaniel's severe injuries of October 30, 2007. Dr. Lakin's skeletal survey revealed the presence of healing fractures in Jimmy, Jr., but Dr. Lakin was unable to pinpoint when the injuries occurred, even suggesting that the injuries may have occurred when the children were in foster care. Conflicting evidence was presented regarding the existence of, cause of, and seriousness of, the children's other "marks." Based upon Father's apparent absence from the home when Nathaniel was injured and the lack of proof that the children were abused prior to October 30, 2007, we reverse the finding of severe abuse to Nathaniel by Father.

*In re Dakota I*, 2012 WL 1418048, at *11. DCS likewise did not appeal that decision, nor does it argue on appeal that Father's rights should be terminated on the ground of severe abuse. Accordingly, we reverse the finding that the ground of severe abuse was proved against Father.

## V. Persistence of Conditions, Tennessee Code Annotated Section 36-1-113(g)(3)

The trial court also found that both Mother and Father's parental rights should be terminated on the ground of persistence of conditions. Persistence of conditions requires the trial court to find, by clear and convincing evidence, that:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

-14-

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tennessee Code Annotated § 36-1-113(g)(3).[5]

The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. and M.S.*, No. 1999-01286-COA-R3-CV, 2000 WL 964775, at *6 (Tenn. Ct. App. July 13, 2000)(citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). "Where . . . efforts to provide help to improve the

---

[5] We note that termination on the ground of persistence of conditions implicates DCS' obligation to demonstrate that it made reasonable efforts to reunite the child with the parent. *In Re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, n.27 (Tenn. Ct. App. March 9, 2004). When DCS' obligation to make reasonable efforts is implicated, DCS must prove by clear and convincing evidence that it made reasonable efforts. *In Re R.L.F.*, 278 S.W.3d 305, 316 (Tenn. Ct. App .2008). "This burden required that [DCS] present sufficient evidence to enable us to conclude without serious or substantial doubt, that the efforts were reasonable under the circumstances." *Id.* In this case, however, neither Mother nor Father argue on appeal that DCS failed to make reasonable efforts toward reunification. In addition, as previously discussed, because Mother was found to have committed severe abuse, DCS was relieved of making reasonable efforts toward reunification with Mother. However, the Court of Appeals concluded that DCS failed to meet its burden to show that Father committed severe child abuse. DCS was, therefore, required to make reasonable efforts as to Father. Although not specifically raised on appeal, we have thoroughly reviewed the record and conclude that DCS made reasonable efforts toward reunification of Father with the children in this case. Testimony of several DCS case workers show that DCS offered Mother and Father parenting classes and therapeutic supervised visitation, which they declined. In addition, for some time, DCS allowed supervised visitation with the children, but had to cease all visitation when it became disruptive to the children's lives. Although Mother testified at the termination trial that she and Father were offered no services other than those offered with regard to Cody and Seth, the trial court found her testimony lacking in credibility. From the whole of the record, we conclude that DCS proved, by clear and convincing evidence, that it made reasonable efforts to reunify Father with the children.

parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)(quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

It is undisputed that the children in this case were removed from the home more than six months prior to initiation of the termination proceedings. However, Mother and Father argue that the trial court lacked sufficient evidence to conclude that the conditions that led to the children's removal, specifically the alleged physical abuse of Nathaniel, still persist and would, in all reasonable probability, subject the children to further abuse or neglect. We respectfully disagree.

In this case, the evidence clearly shows that Nathaniel was the victim of non-accidental trauma while in Mother's care. While Mother disputes that she is the perpetrator of such abuse, the trial court found her credibility lacking and refused to credit her story. The trial court's credibility determinations will be given great weight by the appellate court. *See Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). Further, Dr. Lakin, an expert in child abuse, examined Nathaniel and concluded that his injuries were not consistent with Mother's story. As previously discussed, the trial court found Dr. Lakin's testimony credible and "compelling." In addition, this Court previously upheld the trial court's finding that Mother committed severe abuse against Nathaniel, stating that:

> The overwhelming evidence in this case indicates that Nathaniel's injuries could not have occurred in the manner explained by Mother and Father. We simply find it implausible that eighteen-month-old Jimmy, Jr. could have climbed into his brother's crib while carrying a telephone or that he possessed the forethought to slide his weapon into the crib prior to entry. Even if we assume, arguendo, that he could do so, the testimony indicates that he nonetheless lacked the ability to inflict repeated blows to Nathaniel's head in order to cause both the significant scratching to his face and the skull fracture, and that, at a minimum, Mother should have heard Nathaniel's screams for help.

We are not persuaded by Mother's version of the events of October 30, 2007, and we find most plausible that Nathaniel's injuries were inflicted by the only adult present that night-Mother. However, even if Nathaniel's injuries were somehow inflicted by a minor child, Mother certainly would have heard the commotion and should have intervened sooner in order to prevent serious injury.

*In re Dakota I*, 2012 WL 1418048, at \*10. Because of this abuse, Nathaniel and the other children were removed from the home and Mother and Father were offered a host of services with a goal of reunification. However, Mother and Father refused to cooperate with DCS in any meaningful way. Mother and Father refused to attend counseling sessions and parenting classes. They refused to sign necessary paperwork to allow the children to receive medical care and refused to bring one of their children medicine that he "desperately needed." Further, Mother and Father have a history of flouting the court's authority with regard to an older child who was found to be living in the home, despite a court order removing the child from their custody. Even more disturbing, Mother and Father refuse to take any responsibility for Nathaniel's injuries or any of the other injuries uncovered in the investigation. Instead, Mother and Father choose either to blame Jimmy, Jr. for Nathaniel's injuries or to believe that DCS has concocted a conspiracy to remove their children from them without cause.

In addition, this is not the first time that DCS has been involved with this family. Father's older children were also removed from the home after there were allegations of abuse. At that time, Mother and Father were offered, and participated in, DCS services, including parenting classes. However, the events in this case show that those services went largely ignored by Mother and Father and that they have refused to make any meaningful changes in their circumstances. This is evidenced by the fact that their younger children were soon removed for similar allegations of abuse. The evidence shows that Mother has diagnosed mental health issues, for which she refuses to seek treatment. Father continues to deny that Mother could have harmed Nathaniel, despite strong evidence and a court ruling that she either perpetrated the abuse or failed to timely intervene. Courts have previously held that a parent who has refused to acknowledge that the other parent committed abuse will be unlikely to protect the children from such abuse in the future. *See In re H.L.F.*, 297 S.W.3d 223, 232 (Tenn. Ct. App. 2009) (affirming the trial court's termination of mother's parental rights, when the trial court concluded that mother "is unbelieving [that Father committed severe abuse] and therefore would not be protective of the children"). Indeed, neither parent has taken any responsibility for the host of injuries, scars, and marks found on the children. In light of their continued refusal to take responsibility for the children's injuries, as well as their continued belief that they have done nothing wrong, it is unlikely that Mother or Father will change their behavior to prevent such abuse in the future. *See In re Emily N.I.*, No.

E2011-01439-COA-R3-PT, 2012 WL 1940810 (Tenn. Ct. App. May 30, 2012) (holding that because "[n]either parent accepted full responsibility for their actions, and the Parents expressed doubt regarding the reasons for the removal of the Children . . . , there was little likelihood that the conditions prohibiting the return of the Children would be remedied").

Finally, the Center performed an evaluation on Mother and Father and concluded that neither Mother nor Father had made any meaningful changes in their circumstances, which would allow the children to be returned to them. This is in spite of the fact that DCS has offered Mother and Father myriad services. Specifically, with regard to Father, the Center's report stated:

> It is difficult to know what to recommend for [Father]. He and his wife have reportedly been previously required to go through counseling, parenting training, etc. in regard to their children's safety and this seems not to have been effective. In spite of all the referrals and all of the interventions that [Father] has gone through, his insight still seems very poor, pointing to a poor prognosis for future change. His defensiveness and projection of blame seem to preclude insight and awareness of what he needs to change.

With regard to future placement of the children, the Center stated:

> [Parents] have been given access to an array of outpatient services over the last five years, and yet, serious problems persist. In regard to their children's safety, the services seem not to have been effective. In spite of all the referrals and all of the interventions, [Parents'] insight still seems very poor, pointing to a poor prognosis for future change. Their defensiveness and projection of blame seem to preclude insight and awareness of what they need to change. Considering the seriousness of injuries to Nathaniel and Jimmy, Jr. without plausible explanation, any child placed in the care of [Parents] should be considered to be at immediate risk of physical harm.

> * * *

> To summarize, there is a pattern over the past five years of the[] children sustaining serious injuries while in the care of [Father] and [Mother], whether as the result of their willful

neglect of the children, lack of awareness or ability, use of harsh or extreme methods of discipline, or outright physical abuse. The array of services provided to the family has not resulted in remediation of this problem. Therefore, based on the information available to the [Center] Evaluation Team including the collective results of the evaluation of family members, it is strongly recommended that no child be placed in the care of [Father] and [Mother].

Accordingly, the evidence shows that the conditions that led to the children's removal, specifically the likelihood of physical abuse, still persist, and there is little likelihood that these conditions will be ever be remedied, much less at an early date, in order to allow the children to be returned.

Further, the record shows that these children have been in state custody since they were removed from the Parents in 2007 and that, at no time, did DCS discern that Mother or Father had made changes warranting even unsupervised visitation, much less return of the children. Indeed, the foster mother in this case only agreed to accept the children when DCS informed her that it was pursuing termination of Mother and Father's parental rights. Accordingly, continuation of the parental relationship of Mother and Father would hinder the children's placement with their current foster mother, with whom they have undisputedly bonded. Therefore, we conclude that DCS has proven the ground of persistence of conditions as to both Mother and Father by clear and convincing evidence.

Mother and Father argue, however, that because the trial court returned their youngest child to them after the conclusion of the termination proceedings in the trial court, conditions cannot persist that would prevent the return of the children at issue. We, again, respectfully disagree. We have reviewed the evidence that was before the trial court when it terminated Mother and Father's parental rights with regard to Dakota, Jimmy, Jr., and Nathaniel and have concluded that it supports a finding of persistence of conditions. The trial court ruled that Michael should be returned to Mother and Father after the conclusion of the proceedings at issue in this case. According to Mother and Father's testimony at the termination hearing, they were making efforts to keep Michael by complying with DCS' requests. However, the evidence shows that Mother and Father were largely uncooperative regarding the children at issue in this case. Mother and Father attached the order returning Michael to their custody to their appellate brief. It is well-settled that attaching a document to a party's appellate brief does not make the document part of the appellate record. *UT Med. Group, Inc. v. Vogt*, 235 S.W.3d 110, 112 (Tenn. 2007) (citing Tenn. R .App. P. 13(c); *Sherrod v. Wix*, 849 S.W.2d 780, 783 (Tenn. Ct. App. 1992)); see also *Grover L. Dunigan v. State*, No. E2005-01574-CCA-R3-PC, 2006 WL 433699, at *3 (Tenn. Crim. App. Feb.23, 2006) perm.

app. denied (Tenn. June 26, 2006) (stating that "documents attached to an appellate brief but not included in the record on appeal cannot be considered by this court as part of the record on appeal")). Even assuming, *arguendo*, that the order is properly before this Court, the trial court's order provides no reasoning for its decision to return Michael to Parents less than one month after terminating Mother and Father's rights to their three older children. Accordingly, we are unable to discern the trial court's justification for doing so.  In any event, the evidence that was before the trial court regarding Michael, which is not included in the record on appeal, does not alter the fact that our record establishes that persistent conditions existed at the time of the termination trial that prevented the return of Dakota, Jimmy, Jr., and Nathaniel to Parents at any time in the foreseeable future. Therefore, clear and convincing evidence exists in the record to support termination of Mother and Father's parental rights on this ground.

## VI. Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit upon establishment of a ground for termination of parental rights, then the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). The focus shifts to the child's best interest. *Id*. at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). "The child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. *See* Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877.

We have thoroughly reviewed the record and conclude that clear and convincing evidence supports the trial court's finding that termination of parental rights is in the

children's best interest. The evidence in this case shows that the children were removed from the home in 2007 and that all visitation with Mother and Father ceased in 2009. Further, the evidence is undisputed that the children have a close and loving bond with Ms. Johnson, that they are flourishing in her care, and that she hopes to adopt them. In contrast, the evidence shows that the children were so disturbed by visits with Mother and Father and the visits were so disruptive to their lives, that visits were ordered stopped. Nothing in the record suggests that Mother and Father made any meaningful effort to be reunited with these children prior to the termination hearing. Instead, Mother and Father refused to seek counseling, attend parenting classes, or even complete paperwork so that their children could receive medical care. We note that Mother and Father stated, at the termination hearing, that they would follow all DCS' recommendations in the future if their rights were not terminated. We find these statements of little assurance, especially in light of the fact that Mother and Father have consistently maintained that they have done nothing wrong in this case and that no changes in their parenting techniques are warranted. The children at issue have a chance of permanency with Ms. Johnson and it is in their best interests that Mother and Father's parental rights be terminated so that they can enjoy the stability that a permanent home will bring. As succinctly stated by Ms. Ballard at the termination hearing:

> Well, these children have been in limbo since 2007, okay. When is it time for them to get to have some permanency? You know, not about mom and dad, but what about these little kids over here? They need a permanent place to call home, that they know somebody's not going to come yank 'era up and take 'em somewhere else. So, my main concern here is for those children. It's time. It's -- it's past time. They shouldn't have to live in limbo like that.

Accordingly, the judgment of the trial court that termination of Parents' parental rights is in the children's best interest is affirmed.

## VII. Conclusion

The judgment of the Juvenile Court of McNairy County is reversed in part, affirmed in part, and remanded for all further proceedings as may be necessary and consistent with this opinion. Costs of this appeal are taxed to Appellants Jimmy R. and Roseanna R. Because Appellants are proceeding, *in forma pauperis*, in this appeal, execution may issue for costs if necessary.

_____
J. STEVEN STAFFORD, JUDGE