IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned On Briefs September 15, 2015

IN RE: JATAVIOUS M.

Direct Appeal from the Chancery Court for Shelby County
No. CH-14-0160-3     Oscar C. Carr, III, Chancellor

No. W2015-00865-COA-R3-PT – Filed October 1, 2015

This appeal involves the termination of a mother's parental rights to her severely disabled son. The trial court found by clear and convincing evidence that several grounds for termination exist and that termination is in the child's best interest. On appeal, the mother challenges only the best interest finding. We affirm and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., joined. KENNY ARMSTRONG, J., not participating.

Chasity Sharp Grice, Memphis, Tennessee, for the appellant, Kiana M.

Herbert H. Slatery, III, Attorney General and Reporter and Kathryn A. Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. FACTS & PROCEDURAL HISTORY**

Jatavious M. was born in July 2001. He suffers from complex medical issues including hydrocephalus and ventriculoperitoneal shunt, cerebral palsy, seizure disorder, spastic quadriplegia, reactive airway disease, obstructive airway disease, and bilateral hip dislocation. He cannot speak and uses a wheelchair.

Jatavious first became involved with the Tennessee Department of Children's Services ("DCS") in May 2010, at the age of eight, when DCS received a referral alleging medical neglect. Jatavious had been taken to the emergency room due to

seizures, and doctors discovered that he had no medication in his system. DCS placed therapeutic family support services in the home to educate Jatavious's mother ("Mother") on how to properly care for him. In August 2010, Mother was advised that Jatavious needed a G-tube, or feeding tube, to assist him with feedings and receiving medication. At a child and family team meeting with DCS in September 2010, Mother was specifically instructed to secure a primary care physician for Jatavious and obtain a feeding tube for him. Mother still had not secured a primary care physician or a feeding tube for Jatavious by December 2010.

On December 3, 2010, DCS filed a petition to adjudicate Jatavious dependent and neglected and the victim of severe abuse. That same day, the Juvenile Court of Shelby County entered a protective custody order finding that Jatavious was in need of immediate protection and placing him in the temporary custody of DCS. DCS entered a permanency plan noting its concern that Mother did not understand the extent of Jatavious's medical needs or follow through with his appointments. The plan required Mother to ensure that Jatavious's medical needs were met, attend a class regarding medically fragile children, visit him in foster care, and pay child support. Jatavious was allowed to return to Mother's home in March 2011, and the dependency and neglect petition was dismissed without prejudice at the request of DCS.

Sadly, DCS received three more referrals regarding Jatavious for medical maltreatment and nutritional neglect in the months after he returned to Mother's custody. Jatavious re-entered DCS custody in January 2012, after being hospitalized for failure to thrive and respiratory distress. The juvenile court entered a protective custody order, noting reports that Mother had been turning away home health care workers sent to provide daily care for Jatavious. According to the order, Jatavious was dirty and severely dehydrated when he arrived at the hospital. Upon admission, he gained four pounds within 48 hours. The doctors were reluctant to discharge Jatavious to Mother because her care of Jatavious was questionable. Based on Mother's promise to immediately engage home health care upon discharge, she was permitted to take Jatavious home on January 7. However, Jatavious was rushed back to the emergency room two days later due to airway problems. Jatavious was placed on palliative care and in a hospice situation. Mother had not contacted the home health care workers nor had she filled Jatavious's medications upon his release from the hospital. Jatavious was placed in DCS custody on or about January 18, 2012, and he entered a foster home for medically fragile children. DCS filed another petition for dependency and neglect that same day.

DCS entered into several permanency plans with Mother over the next few months. She was required to pay child support, visit Jatavious, attend his medical appointments and school related meetings, and complete a parenting assessment and mental health assessment. The DCS case worker assigned to Jatavious's case explained

to Mother that if she did not visit or support Jatavious or otherwise comply with the permanency plan, her parental rights could be terminated. Mother signed the criteria for terminating parental rights and was given a copy.

The juvenile court adjudicated Jatavious dependent and neglected on October 26, 2012. The court found that "the mother has abandoned said child," who "suffers from severe medical disabilities, which the mother has failed to address, and from which the Court finds that said child has suffered severe abuse as defined § 37-1-102 (b)(23)(A)." Mother did not appear at the trial but filed a motion for rehearing.

In December 2012, an amended permanency plan was entered, which required Mother to visit with Jatavious for twelve hours every Saturday at his foster home in order to receive training from his nurses on how to care for him. Mother had visited Jatavious a total of ten times in 2012, with most of the visits lasting thirty minutes or less. The plan also required Mother to complete training in order to learn how to care for Jatavious's tracheostomy.

In March 2013, Mother failed to appear at the rehearing of the dependency and neglect petition, so the petition for rehearing was dismissed. Mother visited Jatavious regularly and frequently in the early part of 2013; however, she stopped abruptly in mid-July, only visiting Jatavious twice more that year, in October. The permanency plan was amended in October and added a requirement that Mother obtain income and housing sufficient for Jatavious's medical equipment.

On January 17, 2014, Mother visited Jatavious for fifteen minutes. On January 31, 2014, DCS filed a petition to terminate Mother's parental rights on the grounds of abandonment by willful failure to visit or support, substantial noncompliance with the permanency plans, persistent conditions, and severe child abuse. The trial court held a hearing on the petition in March 2015. The trial court heard testimony from Jatavious's DCS case worker, his home health nurse, his foster mother, and Mother. The trial court found clear and convincing evidence to support termination of Mother's parental rights on all grounds alleged – abandonment by willful failure to visit and willful failure to support; substantial noncompliance with the permanency plans; persistent conditions; and severe child abuse. The trial court also found by clear and convincing evidence that termination of Mother's parental rights was in Jatavious's best interest. Mother timely filed a notice of appeal.

## II. ISSUES PRESENTED[1]

---

[1]The trial court also terminated the parental rights of Jatavious's father, but he did not appeal that decision.

Mother raises a single issue for our review on appeal:

1.    Whether there was clear and convincing evidence that terminating Mother's parental rights is in the best interest of the child.

For the following reasons, we affirm the decision of the chancery court and remand for further proceedings.

### III. STANDARDS FOR REVIEWING TERMINATION CASES

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.*, 254 S.W.3d at 437. A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010); *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Audrey S.*, 182 S.W.3d at 860. In light of the constitutional dimension of the rights at stake in a termination proceeding, the person seeking to terminate these rights must prove all the elements of the case by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). In sum, in order to terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination, but also that termination is in the child's best interest. *In re Adoption of Angela E.*, 402 S.W.3d

636, 639 (Tenn. 2013); *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) amount to clear and convincing evidence that one of the statutory grounds for termination exists. *Id.* at 639-40. Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008) (citing *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008)). We must also determine whether the trial court's best interest finding is supported by clear and convincing evidence.

## IV. ANALYSIS

In this case, Mother does not challenge the trial court's findings with regard to the grounds for termination. However, in the interest of completeness, we have carefully and thoroughly reviewed the record on appeal and determined that all of the above stated grounds for termination were proven by clear and convincing evidence.

Mother's argument on appeal centers on the best interest finding. Tennessee Code Annotated section 36-1-113(i) provides a list of factors that are relevant when deciding what is in a child's best interest. However, the list is not exhaustive. In addition, the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Jacobe M.J.*, 434 S.W.3d 565, 574 (Tenn. Ct. App. 2013).

In this case, the evidence clearly and convincingly supports the trial court's finding that termination is in Jatavious's best interest. By the time of trial in March 2015, Jatavious was thirteen years old, and he had been in his current foster home for about three years. During that time, Mother had only called the foster mother to check on Jatavious once or twice. Although Mother had some periods of consistent visitation with Jatavious, she abruptly stopped visiting in July 2013. For the remainder of 2013, she saw Jatavious only twice in October. She saw him once in January 2014 for fifteen minutes. After the termination petition was filed in January 2014, Mother visited Jatavious nine

5

more times that year, but over half of those visits lasted only fifteen to twenty-five minutes. She never once provided financial support to Jatavious while he was in foster care and offered no excuse as to why.

We agree with the opinion of Jatavious's case worker that it is simply unlikely that Mother will be able to provide a safe and stable permanent home for Jatavious at any time in the near future. It is not even clear from Mother's testimony that she believed she would be able to care for Jatavious in the near future. When asked her opinion as to whether termination of her parental rights was in Jatavious's best interest, Mother responded, "I think it is not fair because I still want to see him from time to time." At the time of trial, Mother lived in a two-bedroom home with her boyfriend and three very young children. Mother and her boyfriend had a history of domestic violence that continued even during the termination proceedings. Mother had been diagnosed with "bipolar and anxiety," but her mental health records indicated she was "typically non-compliant" with her treatment plan.

The home health nurse who had cared for Jatavious for over three years testified, based on her observation of Mother, that Mother was not sufficiently trained to care for Jatavious. She testified that Mother needed extensive training on how to care for a tracheotomy tube ("trach"), in addition to CPR training. She explained that Mother would not know how to respond in the event of an emergency, if the trach tube was accidentally pulled out or if something was lodged in the tube. DCS repeatedly asked Mother to participate in trach training, beginning in December 2012, but she never completed it.

Jatavious's foster mother received the necessary training to care for the trach tube before Jatavious left the hospital to enter her home. When Jatavious entered the home, he was considered to be in a hospice situation. He was in a lot of pain and cried "all of the time," according to his foster mother. Since that time, his condition has improved, as he has gained weight, his school reports that he is responsive to social interactions, he smiles, and he no longer cries all the time. The foster mother has adopted another child with special needs, who also has a trach tube and feeding tube, so she is familiar with the care that Jatavious requires. The foster mother desires to adopt Jatavious if Mother's parental rights are terminated.

Mother argues on appeal "there was no evidence that the visits with the mother harmed the child." However, in cases such as this, "the question is the likelihood that the child can be safely returned to the custody of the parent, not whether the child can safely remain in foster care with periodic visits with the parent." *In re Grace Y.*, No. M2013-02734-COA-R3-PT, 2014 WL 4930784, at *3 (Tenn. Ct. App. Sept. 30, 2014) (*no perm. app. filed*) (citing *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at

*5 (Tenn. Ct. App. July 21, 2000)).  The goal is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'"  *Id.* (quoting *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012)).  "It is not necessary to prove that a parent-child relationship cannot be salvaged, nor is it necessary to show that a parent is 'currently harmful' to a child's safety or future emotional stability."  *Id.* (quoting *In re K.A.H.*, 2000 WL 1006959, at *5).  The statutes governing termination of parental rights recognize a child's need for a permanent, stable environment.  *Id.*

The trial court and DCS also considered the fact that Mother had no "support person" who was trained to care for Jatavious's medical needs in the event that Mother was unable to care for him.  Mother argues that this unfairly penalized her for not having a supportive family.  We disagree.  It is not unfair to Mother to consider this fact; it would be unfair to Jatavious to ignore it.  The best interest of a child must be determined from the child's perspective and not the parent's.  *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013).

## V.  CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed and remanded for further proceedings.  Costs of this appeal are taxed to appellant, Kiana M., for which execution may issue for costs, if necessary.

_____
BRANDON O. GIBSON, JUDGE

7