IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 25, 2015

**IN RE ROGER T., ET AL.**

**Appeal from the Juvenile Court for Decatur County**
**No. 12JV81    Ricky L. Wood, Judge**

---

**No. W2014-02184-COA-R3-PT – Filed April 27, 2015**

---

In this appeal, R.C.B. ("Mother") contends that the trial court erred in terminating her parental rights. Because the grounds for termination are met by clear and convincing evidence, and there is also clear and convincing evidence that termination is in the best interests of the minor children at issue, we affirm.

**Tenn. R. App. P. 3 Appeal of Right; Judgment of the Juvenile Court Affirmed**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which BRANDON O. GIBSON, J., and KENNY ARMSTRONG, J., joined.

Stephanie Rhiannon Cody, Lexington, Tennessee, for the appellant, R.C.B.

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. Background**

In this appeal, we review the trial court's termination of Mother's parental rights. Mother's oldest child, R.C.T. (born 7/22/99), was fathered by R.D.T. Mother's second oldest child, K.S.R. (born 9/29/01), was fathered by J.S.R. J.S.R. died in 2009. Mother's youngest child, A.J.H.B. (born 7/5/06), was fathered by A.L.B.[1] Although the trial court terminated he

---

[1] In cases involving minor children, it is the policy of this Court to use the initials of children and parties to protect the privacy of the children involved.

parental rights of R.D.T. and A.L.B. in addition to those of Mother, only Mother appealed to this Court.

By her own admission, Mother has used drugs "[o]ff and on" since she was thirteen years of age. Her struggles with drug use have posed significant challenges for both her and her children. In 2007, the Department of Children's Services ("DCS") removed the minor children from Mother, in part, due to her drug use. Although Mother later regained custody of the children, she struggled to maintain sobriety. Indeed, at the time of trial in this case in August 2014, she was participating in a drug treatment program at a facility in Memphis.

The children entered the custody of DCS for a second time on June 5, 2012. DCS had received a report that the children did not have a guardian, and when an investigator for Child Protective Services looked into the matter, he discovered that the children were living in a camper belonging to one of Mother's paramours, D. H. ("Mr. H."). The investigator found that the camper did not have enough room for the children and that there was not enough food in the home. Mr. H., a convicted criminal and methamphetamine user per Mother's testimony, was not present at the time the investigator arrived. Mother was also not present at the camper, as she was incarcerated in the Henderson County Jail at the time.[2] When Mother was screened for drugs at the Henderson County Jail on June 6, 2012, she tested positive for amphetamines, methamphetamine, and opiates.

On June 7, 2012, DCS filed a petition in the trial court asking that the children be adjudicated dependent and neglected. The petition recounted the investigation conducted by Child Protective Services on June 5, 2012, and stated that DCS had received a report that the children had been subjected to drugs, physical abuse, and environmental neglect. In its prayer, DCS requested the trial court to enter an order placing temporary care of the children with the State. A protective custody order giving custody of the children to DCS was subsequently entered. On September 6, 2012, DCS amended its dependency and neglect petition to include allegations of severe abuse against Mother. The children were ultimately declared dependent and neglected by an order entered on June 2, 2014. The trial court's order, which also found A.J.H.B. to be a victim of severe child abuse, noted that it was a final order in accordance with Rule 36 of the Tennessee Rules of Juvenile Procedure.

---

[2] Mother testified she was incarcerated for a violation of probation in connection with a charge of driving on a suspended license. Immediately subsequent to her jail time in Henderson County, Mother spent jail time in Chester County, which had a hold on her in relation to another probation violation.

After the filing of the dependency and neglect petition, several permanency plans were created. In part, these plans required Mother to: not associate with people who use drugs; only leave her children with people she trusts and knows do not use drugs; talk to the children about the harms drugs cause; schedule an intake assessment, and after completing it, follow its recommendations; submit to random drug screens; obtain safe and stable housing; work on her alcohol and drug issues; find employment; and meet the children's financial needs. The first permanency plan, dated July 16, 2012, was ratified by the trial court on October 15, 2012. The specific goal of the plan was to return the children to Mother. However, by the time the last permanency plan was created in June of 2014, the permanency goal had changed—over Mother's objection—to adoption of the minor children.[3] In addition to the permanency plans that were created, Mother signed the Criteria and Procedures for Termination of Parental Rights on several occasions. This form gave notice of the grounds pursuant to which Mother's parental rights could be terminated.

On November 26, 2013, DCS filed a petition to terminate the parental rights of Mother, R.D.T., and A.L.B. As grounds for terminating Mother's rights, the petition alleged as follows: (1) Mother abandoned the children by willfully failing to visit them and/or willfully failing to contribute to their support; (2) Mother abandoned the children by failing to establish a suitable home; (3) Mother had not substantially complied with the permanency plans; (4) the conditions that led to the removal of the children still existed and thus prevented their return; and (5) Mother committed severe child abuse against A.J.B.H. Mother filed a response to DCS's petition on July 7, 2014. A trial was held on August 18, 2014. The first witness to testify was Nicole Schleuning ("Ms. Schleuning"), a family service worker with DCS. Ms. Schleuning described her role with DCS as a foster care case manager. Specifically, she noted that she meets with children and their parents to work towards reunification. Ms. Schleuning testified that she began working on the case involving Mother and the children approximately two weeks after the children entered DCS's custody in June 2012. She indicated that the children had never exited DCS's custody since that time, and that the children had not had a trial visit with Mother since she was working on the case.

In addition to testifying to details of the permanency plans that were created, including Mother's responsibilities under them, Ms. Schleuning testified as to Mother's success in completing the rehabilitation and reunification goals that had been outlined. In pertinent part, Ms. Schleuning testified as to Mother's efforts at completing a long-term rehabilitation

---

[3] The permanency plan created in June 2014 was ratified by the trial court on July 7, 2014. A sole goal of adoption was first established in the permanency plan created on November 26, 2013. The November 26, 2013, permanency plan was ratified by the trial court on February 3, 2014. Mother's whereabouts were unknown when the November 26, 2013, permanency plan was created. In addition to the permanency plans already mentioned, other permanency plans were created on December 4, 2012, and May 28, 2013.

program.[4]  Ms. Schleuning testified that Mother first participated in a treatment program at New Leaf, a facility in Cookeville, Tennessee.  Although Ms. Schleuning indicated that the treatment program at New Leaf was scheduled to be a twenty-eight day program, she testified that Mother was discharged from the program after eleven days due to inappropriate behavior.[5]  Mother's stay at New Leaf was not her only attempt to address her drug issues, and Ms. Schleuning testified that Mother later entered Pathways in Jackson, Tennessee, for five days in order to detox before starting a ninety-day treatment program at Memphis Recovery Center.  Despite starting the program at Memphis Recovery Center following her detox in Jackson, Mother failed to complete the program due to more inappropriate conduct.[6]  According to Ms. Schleuning, although Mother was given the option to start over in the program, Mother was not willing to do so and was discharged.[7]

Despite Mother's failure to complete these prior programs, Ms. Schleuning testified that Mother entered a treatment program in May 2014 at Grace House in Memphis.[8]  Despite suggesting that there had been "some bumps in the road," Ms. Schleuning testified that Mother was still participating in the program as of the date of trial.  Ms. Schleuning testified that the program at Grace House was scheduled to last for six months.

Through her testimony, Ms. Schleuning described the various ways she had attempted to assist Mother achieve the steps outlined in the permanency plans.  For example, Ms. Schleuning testified that she had entered several case service requests on behalf of Mother, provided transportation to Mother's rehabilitation programs, and taken the children to visit Mother on a number of occasions.  Ms. Schleuning also testified as to her efforts in assisting the children.  She testified that in addition to facilitating therapeutic supervised visitation between Mother and the children, she had ensured that the children's medical, dental, educational, and mental health needs were met.

---

[4] Mother's intake assessment recommended that she stay in a long-term rehabilitation facility in order to address her drug needs.

[5] According to Ms. Schleuning, "a letter passed between a male client and [Mother] . . . that was against the rules[.]"

[6] Similar to her stay in Cookeville, Mother once again apparently engaged in what was considered "inappropriate correspondence with a male client."

[7] Although Ms. Schleuning testified that the documentation indicated Mother stayed at Memphis Recovery Center for thirty-six days, Ms. Schleuning testified she thought Mother's stay was closer to sixty days.

[8] According to Ms. Schleuning's testimony, Mother found Grace House through her own efforts.

4

Ms. Schleuning also testified as to Mother's success at remaining drug free. She indicated that DCS conducted several drug screens and that Mother had tested "positive at different times for different drugs." Ms. Schleuning described how Mother had tested positive for several drugs on June 6, 2012, and then tested positive again on August 30, 2012. According to Ms. Schleuning, Mother even confessed to being high during one of the occasions on which Ms. Schleuning transported Mother to rehabilitation. Moreover, out of the approximately twenty to thirty drug screens DCS administered since the children's removal in June of 2012, Ms. Schleuning estimated that Mother passed only one. Ms. Schleuning also testified to the various crimes Mother had been charged with subsequent to the children's removal in June 2012. These crimes included two charges for driving on a suspended license, one domestic assault charge, a failure to appear charge, a possession of drug paraphernalia charge, and a simple possession charge.

Regarding the impact of Mother's drug use on her visitation with the children, Ms. Schleuning testified that DCS allowed supervised visitation so long as Mother could provide a negative drug screen. This requirement, she noted, had not resulted in a lot of visits. Although Mother and the children frequently participated in supervised visitation in the months following June 2012, Ms. Schleuning stated that visitation was stopped in December 2012 due to Mother's admission that she was using morphine.[9] Ms. Schleuning further testified that, between December 2012 and December 2013, Mother probably visited the children only twice. She stated that one of these visits had been in the spring of 2013, when the children visited with Mother at Memphis Recovery Center. According to Ms. Schleuning, there was a six-month period where Mother was not in contact with her own attorney or DCS. We note that at the time DCS filed its termination petition, Mother's whereabouts were unknown.

Ms. Schleuning further testified that Mother exercised no visitation with the children from December 2013 to May 2014. She estimated that in the two years prior to trial, Mother probably spent less than seventy-five hours with the children. Following Mother's entry to the treatment program at Grace House in May 2014, however, Ms. Schleuning noted that Mother visited with the children on a couple of occasions. She testified that she personally observed one of Mother's visitations with the children and that it had gone "[v]ery well."

Ms. Schleuning testified that all three children had been placed in foster care with M.A. and D. A. ("Mr. & Mrs. A.") since June 2012, and she stated that she observed the children at Mr. & Mrs. A.'s home during her time on the case. In addition to stating that the

---

[9] A quarterly progress report prepared by the Department in February 2013 indicated that "[p]arent/child visits are not currently taking place due to the mother refusing to submit to random drug screens or testing positive for drugs."

home was safe and appropriate for the children, Ms. Schleuning testified that Mr. & Mrs. A. involved the children in a lot of extra-curricular activities. For example, she testified that the children had been active church participants and were involved in several sports. She further indicated that the children questioned why Mother had not done what she needed to do in order to regain custody.

Concerning the relationship between Mother and the children, Ms. Schleuning testified that, with the exception of one gift brought by Mr. H. on behalf of Mother in July 2012, none of the children received birthday gifts or cards from Mother since coming into custody of DCS. She did specifically note, however, that the children were bonding with Mother in the recent visits that had been allowed since Mother entered Grace House. She also testified that all three children wished to return to Mother. Although Ms. Schleuning further stated that she had seen a change in Mother since Mother's arrival at Grace House, she ultimately opined that it would be in the children's best interests for Mother's parental rights to be terminated. Ms. Schleuning acknowledged that an adoptive home had not been identified at the time of trial, but she testified that DCS had already begun the search for one.

The trial court also heard testimony from Shante Caper ("Ms. Caper"), Mother's counselor at Grace House in Memphis. Ms. Caper testified that Mother checked into Grace House on May 12, 2014. According to Ms. Caper, at the time of trial, Mother was on the second level of what was described as a three-level treatment program. She testified that Mother participated in several types of counseling sessions and meetings at Grace House in order to address her drug issues. When asked how Mother was doing in the program, Ms. Caper testified that "[s]he's been doing well." She stated that although Mother had been screened for drugs both on the date of trial and three days prior, she received a negative reading on both occasions. Ms. Caper's testimony did recount one occasion, however, where Mother engaged in behavior not allowed by the treatment program. Ms. Caper testified that about a week prior to trial, Mother left a medical appointment unauthorized, with the apparent intention to buy some soda. A drug screen conducted upon Mother's return did not result in a positive reading, but Mother received a ten-day restriction as discipline, which prohibited her from making phone calls, receiving mail, and having visitors.

Notwithstanding Mother's previous failures to complete a drug treatment program prior to May 2014, Ms. Caper opined that Mother had committed herself to the process of rehabilitation at Grace House. She further testified that Grace House has an extended transitional program available following a participant's completion of the standard six-month program offered at Grace House. Ms. Caper compared this aftercare option to a halfway house and indicated that it could potentially be an option that Mother could pursue.

Mother's testimony at trial covered many areas, including her history of drug use and prospects for rehabilitation. Mother testified that she was incarcerated in June, 2012, when the children were removed from Mr. H's camper. She stated that she lived with Mr. H in the camper prior to her incarceration and further testified that the children would stay in the camper on weekends during the school year. She explained that the children lived with a friend of hers on weekdays when school was in session. With regard to her drug problems, Mother was extremely forthcoming. She admitted that she had been a drug user since the age of thirteen and did not deny that she had frequently used drugs during the two years the children had been in custody of the Department. She also did not deny that she had been arrested and criminally charged several times during that two-year timeframe.

When questioned how many times she visited the children since their removal, Mother stated that she was not sure of the exact number, but "kn[e]w it ha[d]n't been as many as it should." She further admitted that she had not contributed any financial support to the children during that period. When asked if she had a particular reason why, Mother replied, "Not a very good one, no." Mother also testified as to her whereabouts during the six-month period when she was not in contact with DCS. Mother admitted to using drugs in this period and testified that she did not work or file for disability. She further testified that she had prostituted herself in order to obtain drugs.

Although Mother testified that she had not successfully completed the prior drug treatment programs in which she participated, she expressed optimism in achieving success at Grace House. Nonetheless, she indicated that her recovery was still ongoing:

> I'm not ready to be out in the world yet. I'm not -- I don't want to lose custody of my kids. Whatever happens, I have to deal with, but as of right this moment, I know that I'm not emotionally, and I'm not physically ready to be out in the world yet as far as my addiction goes, and my addiction affected my kids as well.

In addition to testifying that she could give no assurances of what progress she would achieve in the coming months at Grace House, Mother expressed uncertainty as to when she would finally complete treatment. Specifically, Mother indicated that she was planning on applying for the transitional extended program offered at Grace House. Mother testified that her participation in the extended program could potentially last as long as two to three years.

The last witness to testify was M. A. ("Mr. A."). Mr. A. testified that he and his wife had served as foster parents for the minor children since June 2012. He stated that the children adjusted well while in his and his wife's care, and he testified that the children participated in sports, assisted with household chores, and regularly attended Sunday church

services. Mr. A. also testified that Mother had not given any type of financial support for the children since they had been in his care. Although Mr. A. indicated that he and his wife were not willing to adopt the children, he testified that he and his wife were willing to care for the children until a permanent placement was found. He further testified that he believed the children would be happy if they could return to Mother once she gets herself together.

On September 26, 2014, the trial court entered an order terminating Mother's parental rights. In addition to finding that all of the grounds for termination alleged in DCS's petition were proven by clear and convincing evidence, the trial court's order of termination found by clear and convincing evidence that the termination of Mother's parental rights was in the children's best interests. Mother subsequently initiated the present appeal.

## II. Issues

We address the following issues in this appeal:

> 1. Whether there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on the grounds of (1) abandonment by willful failure to visit and/or contribute to the children's support; (2) abandonment by failure to establish a suitable home; (3) failure to substantially comply with the permanency plans; (4) persistence of conditions; and (5) severe child abuse.

> 2. Whether there is clear and convincing evidence to support the trial court's finding that termination of Mother's parental rights is in the children's best interests.

## III. Standard of Review

Under both the federal and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Notwithstanding the fundamental nature of this right, however, it is not absolute. *In re S.Y.*, 121 S.W.3d 358, 366 (Tenn. Ct. App. 2003). Well-defined circumstances exist under which a parent's rights may be terminated. In Tennessee, these circumstances are defined by statute. *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Such evidence "produces in a fact-

finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). As this is a higher standard of proof than that which applies in most civil cases, on appeal we must modify the customary standard of review provided for by Rule 13(d) of the Tennessee Rules of Appellate Procedure. *In re Audrey S.*, 182 S.W.3d at 861. "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.*

## IV. Analysis

### *Grounds for Termination*

We first review the trial court's finding that Mother abandoned the minor children by failing to visit or financially support them. As one of the grounds for termination, abandonment is statutorily defined as "the willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing Tenn. Code Ann. § 36-1-102(1)(A)(i)). The failure to visit or support a child is willful "when a person is aware of his or her duty to visit or support, has the capacity to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d at 864 (citations omitted).

Having reviewed the record transmitted to us in this case, we find that there is clear and convincing evidence to support the trial court's determination that Mother abandoned the children by failing to visit them in the four-month period preceding the filing of the termination petition. Mother argues in her brief that her failure to visit was not willful because her visitation during this time was suspended by the trial court. In fact, the suspension of Mother's visitation was the direct result of her failure to produce negative drug screens. As this Court has previously noted, a "parent's choice to continue to use drugs when the parent is prohibited from visiting a child until passage of a drug test constitutes a willful failure to visit the child." *In re Morgan S.*, No. E2009-00318-COA-R3-PT, 2010 WL 520972, at *9 (Tenn. Ct. App. Feb. 12, 2010).

Additionally, we find that there is clear and convincing evidence to support the trial court's determination that Mother abandoned the children by willfully failing to support them financially in the four-month period preceding the filing of the termination petition.

9

Although Mother was aware of her duty to provide financial support[10], she testified at trial that she had not contributed any support to the children since they came into DCS's custody. In its order terminating Mother's parental rights, the trial court specifically found that Mother was "able-bodied and able to work[,]" and we note that Mother admitted at trial that she did not have a good reason for failing to provide the children with financial support. Mother did not file for disability benefits, and rather than working in order to help support the children, Mother's testimony indicates that she prostituted herself in order to obtain drugs. The trial court did not err in concluding she abandoned the children based on her failure to support them.

We next address the trial court's finding that Mother abandoned the children by failing to establish a suitable home. This ground of termination, which is defined in Tennessee Code Annotated § 36-1-102(1)(A)(ii), means that:

> The child has been removed from the home of . . . a parent or parents or a guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist . . . a parent or parents or a guardian or guardians to establish a suitable home for the child, but that the . . . parent or parents or a guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

---

[10] As already noted, Mother signed the Criteria and Procedures for Termination of Parental Rights on several occasions.

In its order terminating Mother's parental rights, the trial court made the following findings pertaining to Mother's efforts at providing suitable housing for the children:

> The children at issue were removed from their mother . . . as the result of a Petition filed in Juvenile Court in which the children were found to be dependent and neglected and the children were placed in DCS custody[.]
>
> * * * *
>
> For a period of four (4) months following removal, the DCS has made reasonable efforts to assist [Mother], to establish a suitable home for the children; but [Mother] has made no reasonable efforts to provide a suitable home and has demonstrated a lack of concern for the children to such a degree that it appears unlikely that [Mother] will be able to provide a suitable home for the children at an early date.
>
> * * * *
>
> The reasonable efforts DCS made in the first four months include, but are not limited to, repeatedly referring [Mother] to various rehabilitation programs/providers; providing her with a list of rehabilitation programs; personally going over the list of programs/providers with [Mother] at her home; telephoning providers in an effort to find a suitable rehabilitation facility; . . . arranging for visitation with [Mother's] children when appropriate; . . . arranging for counseling and home services for [Mother]; . . . and updating [Mother] about children's well-being, appointments, and court hearings.
>
> [Mother's] lack of reasonable efforts include but are not limited to, continuing to use illegal drugs, refusing to seek treatment for her drug use; continuing to associate with drug users; [and] failing to maintain safe and stable housing[.]

We fail to discern any error in the trial court's legal conclusion concerning Mother's failure to provide suitable housing for the children. As we have previously pointed out, a suitable home requires more than a "physical space." *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct.

11

App. 2002). It also "requires that the home be free of drugs[.]" *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (citation omitted). When the children were removed on June 5, 2012, they were staying at a camper that lacked both space and food. Mother was incarcerated at the time, and she tested positive for drugs when she was screened on June 6, 2012. Although she stayed in the Henderson and Chester County jails for a total of approximately fifty days following the children's removal, she did not make any significant strides towards providing suitable housing following her release. Notwithstanding DCS's efforts in assisting Mother, Mother's actions in the four months following the children's removal did little to suggest that she would be able to provide a suitable home for the children "at an early date." Tenn. Code. Ann. § 36-1-102(1)(A)(ii) (2014). Mother continued to use drugs following her release, and as pointed out by DCS, she stated that she was homeless when she presented for a diagnostic assessment at a mental health center on August 22, 2012. Moreover, on August 30, 2012, Mother tested positive for amphetamines. As observed by one of Mother's counselors, Mother "made several excuses about her drug use and did not take responsibility at all for her using." Although Mother argues in her brief that her entry into Grace House is evidence of her reasonable efforts to provide a suitable home for the children, we note that Mother did not enter Grace House until May of 2014. When examining the efforts of DCS or a parent under this statutory ground, our inquiry is concerned with only the "four months following the removal." *Id.*

We next review whether the trial court erred in determining that Mother failed to substantially comply with the permanency plans entered in this case, which is a ground for termination pursuant to Tennessee Code Annotated § 36-1-113(g)(2). Termination of parental rights on this basis cannot be predicated on minor or technical deviations from a permanency plan's requirements. *In re M.J.B.*, 140 S.W.3d at 656-67 (citations omitted). DCS must not only "demonstrate . . . that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place," but DCS must also show that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *Id.* at 656 (citations omitted).

As previously discussed, the trial court ratified several permanency plans following the children's entry into DCS's custody. On each occasion a plan was ratified, the trial court found that the requirements outlined therein were reasonable and related to remedying the conditions that necessitated the children's placement in foster care. Among other things, the plans required Mother to submit to random drug screens, stay drug free, complete a long-term rehabilitation treatment program, not associate with people who use drugs, and maintain safe and stable housing.

12

Having reviewed the record, it is clear that addressing Mother's drug use was of central importance to the permanency plans that were entered. Indeed, when the trial court entered its order terminating Mother's parental rights, it stated that "[r]equirements relating to [Mother's] history of drug use are particularly important in reducing the risk of harm to the children so that the children could be safely returned to the parent's care[.]" In making this statement, the trial court referenced the fact that this was the second time the children had been removed from Mother's custody due to her drug use.

Although we recognize that Mother made recent efforts to maintain sobriety as of the date of trial, we nonetheless conclude that there is clear and convincing evidence to support the trial court's determination that Mother failed to substantially comply with the requirements of the permanency plans. The permanency plans directed Mother to complete long-term rehabilitation, but Mother had not done so as of the date of trial.[11] Although she was participating in long-term treatment as of that date, a considerable amount of time remained before Mother could complete the program.[12] In addition, Mother failed to maintain safe and stable housing as directed. Whether these failures constitute substantial noncompliance "is a question of law which we review de novo with no presumption of correctness." *In re Valentine*, 79 S.W.3d at 548. As the Tennessee Supreme Court has previously observed:

> Substantial compliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." *Black's Law Dictionary* 1428 (6th ed. 1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.

*Id.* Mother's completion of a long-term rehabilitation program was a significant requirement to ensure the children could be returned to a safe and stable home. Likewise, it was significant to require Mother to obtain safe and stable housing. These requirements were of "real worth" to enabling any return of the children to Mother. Mother's success at remaining drug free while at Grace House is certainly commendable, but as of the date of trial, she was

---

[11] We note that in the permanency plan created on December 4, 2012, Mother was directed to complete a long-term rehabilitation program by June 4, 2013. In the permanency plan created on May 28, 2013, Mother was directed to complete a long-term rehabilitation program by November 28, 2013.

[12] Mothered entered Grace House on May 12, 2014. According to the evidence presented at trial, the inpatient program at Grace House lasts a total of six months.

uncertain of when she would complete her treatment and be ready "to be out in the world[.]" We note that Mother previously failed to complete two other drug treatment programs, in part, due to her engaging in behavior that was not authorized. Although the testimony reflects that Mother was generally doing well at Grace House, the record is also clear that she engaged in unauthorized behavior while there about a week prior to trial. Given the totality of the circumstances, including Mother's failure to complete drug treatment within the timeframes outlined in the permanency plans and her inability to maintain a safe and stable home, we find the evidence clearly and convincingly establishes that Mother was in substantial noncompliance with the permanency plans.

We next review the trial court's termination of Mother's parental rights based upon persistence of conditions. This ground for termination of parental rights applies when:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the . . . parent or parents or a guardian or guardians, still persist;
> >
> > (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the . . . parent or parents or a guardian or guardians in the near future; and
> >
> > (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3) (2014). In this case, there is no dispute that the children had been removed for a period of at least six months as defined by the statute. The children entered DCS's custody in June 2012 and they were still in DCS's custody as of the date of trial. Their entry into DCS's custody resulted from DCS' response to a report that alleged the children had been drug-exposed, physically abused, and subjected to environmental neglect. When DCS investigated the matter, it found that the children were living in a small camper belonging to one of Mother's paramours, an apparent drug user himself. The camper was not

only lacking in space, but it also lacked sufficient food for the children. Mother was incarcerated at the time. It was these circumstances that prompted the trial court to enter an order of protective custody.

Having reviewed the record transmitted to us, it is clear that conditions still exist that prevent the children's return to Mother. Mother continued to struggle with drugs following the children's removal, and although she was participating in a rehabilitation program as of the date of trial, she had not completed the program and testified that she was uncertain as to when she would be ready to transition back into the world drug-free. Mother had not maintained a suitable home for the children to live in as of the date of trial, and the evidence convincingly suggests that there is little likelihood Mother would be able to provide one at an early date. As already indicated, Mother testified that she wanted to participate in the extended program at Grace House following her planned completion of the standard six-month program. According to her, her participation in this extended program could potentially last as long as two to three years. Mother simply did not demonstrate any ability to be able to care for the children in the foreseeable future.

We next address the trial court's termination of Mother's parental rights based upon the ground of severe child abuse. This ground for termination is outlined in Tennessee Code Annotated § 36-1-113(g)(4) and is established when:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]

In this case, this ground for termination is clearly met. In its June 2, 2014, order, which found the minor children to be dependent and neglected, the trial court stated as follows: "The Court finds that the child, [A.J.H.B.] suffered from abuse and/or neglect and therefore pursuant to T.C.A. 37-1-129(a)(2) finds that the child is a[] victim[] of severe child abuse as defined at T.C.A. 37-1-102(23)(A) and (B), respectively, and perpetrated by his mother[.]" The record transmitted to us indicates that this order was not appealed, and as such, the trial court's findings are *res judicata*. The trial court did not err in terminating Mother's parental rights based upon a prior finding of severe abuse.

*Best Interests of the Children*

15

"When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *In re Dakota C.R.*, 404 S.W.3d 484, 503 (Tenn. Ct. App. 2012) (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). Although terminating an unfit parent's parental rights is not always in the child's best interest, "when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *Id.* (citing Tenn. Code Ann. § 36-1-101(d)). The best interest analysis "must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (citations omitted).

The Tennessee Legislature has codified nine factors that courts should consider in determining the best interest of a child in a termination proceeding. The relevancy of these factors, which are found at Tennessee Code Annotated § 36-1-113(i) (2014), "depends on the unique facts of each case." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a]scertaining a child's best interests does not call for a rote examination" of the factors. *Id.* "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citation omitted).

In this case, the trial court made several findings responsive to the factors outlined in the statute. The trial court stated that Mother had failed to make lasting adjustments with regard to her drug use and specifically found that her treatment at Grace House was "only in the infancy stages[.]" It characterized her sobriety as of the date of trial as "fragile at best," and found that it "would be unfair to further delay the children's permanency until a time in the future when [Mother] may or may not complete [treatment.]" Although the trial court acknowledged that the children had a prior relationship with Mother, it concluded that a return of the children to Mother would "likely …have a negative effect on the children's emotional, psychological and/or medical condition." In support of this finding, the trial court noted that the children were "thriving" in their placement with Mr. & Mrs. A. It further noted that Mr. & Mrs. A. are willing to care for the children until an adoptive home is found.

Although we realize that Mother was participating in a drug rehabilitation program when this case came to be heard at trial, we conclude there is clear and convincing evidence that the termination of Mother's parental rights is in the children's best interests. The children need permanency in their lives, and although DCS had not yet located an adoptive placement as of the date of trial, Ms. Schleuning testified that a search for an adoptive home had already begun. There is no guarantee that the children will be adopted, but such a guarantee is not required in order to terminate a parent's parental rights. "At most, Tennessee law requires only that an adoption be contemplated at some point in the future."

16

*In re Audrey S.*, 182 S.W.3d at 879 (Tenn. Ct. App. 2005). Mother's history of drug use has consistently threatened the children's ability to be raised in a safe and stable home, and despite her efforts at Grace House, the evidence does not suggest that Mother will be in a position to care for the children at any point in the near future. Even Mother's own testimony indicated that she could potentially remain in treatment for several years after she completes the primary program offered at Grace House. Her ability to maintain sobriety is certainly a speculative proposition. Given totality of the circumstances, we conclude there is clear and convincing evidence in the record to support the termination of Mother's parental rights.

## V. Conclusion

For the foregoing reasons, we affirm the trial court's order terminating Mother's parental rights and remand the case for such further proceedings as may be necessary and are consistent with this Opinion. Costs on appeal are assessed against the Appellant/Mother, R.C.B., for which execution may issue if necessary.

_____
ARNOLD B. GOLDIN, JUDGE