FILED
08/27/2024
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 1, 2024

## IN RE METRIC D.

**Appeal from the Juvenile Court for Davidson County**
**Nos. 2018-003745; 270458        Sheila Calloway, Judge**

### No. M2023-00700-COA-R3-PT

The juvenile court terminated a mother's and a father's parental rights. The mother challenges the juvenile court's finding by clear and convincing evidence that grounds for termination of her parental rights existed and that termination of her parental rights was in the child's best interest. The father asserts that the juvenile court erred in terminating his parental rights because his due process rights were violated. Because the juvenile court erred in allowing the father's attorney to withdraw from representation, we vacate the court's termination of his parental rights on all grounds and remand for a new trial. We affirm the juvenile court's termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in part, Affirmed in part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CARMA DENNIS MCGEE and KRISTI M. DAVIS, JJ., joined.

Thomas H. Miller, Franklin, Tennessee, for the appellant, Metric D., Sr.

Clayton Michael Cardwell, Nashville, Tennessee, for the appellant, Latisha R.

Jonathan Skrmetti, Attorney General and Reporter, Andrée Blumstein, Solicitor General, and Carrie Perras, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Metric D., III ("the child" or "Metric") was born in October 2018 to Latisha R. ("Mother") and Metric D. Sr., ("Father"). After the child's birth, both Mother and Metric

tested positive for cocaine, and Mother admitted to frequently using the drug during the pregnancy, including using the drug three days before the child's birth. Father was not present at the child's birth because he was incarcerated in Bledsoe County. After entering into an immediate protection agreement regarding the child, Mother completed a drug treatment program in March 2019 and regained custody of the child.

In May 2019, the Department of Children's Services ("DCS" or "the Department") received another referral that the child was drug exposed. In the referral, it was alleged that Mother was sleeping in her car with Metric and had been observed smoking cocaine with Metric present. The referral report included allegations that Mother was so intoxicated from smoking that she had forgotten the child was with her and that she would drive around with Metric in the car with her while seeking out cocaine to purchase and while intoxicated. The Department investigated these claims, and Mother took two drug screens that both returned positive for cocaine. Metric was placed with his maternal aunt under another immediate protection agreement.

By August 2019, Mother had failed to appear for her last two court dates, refused inpatient treatment, failed to maintain contact with DCS, and refused to accept offered services. The Department held an emergency pre-custodial meeting on August 5, 2019, to discuss the risk of Metric entering the state's custody. During that meeting, DCS learned that Mother removed Metric from his approved placement and took him to the home of another of the child's aunts and that he had been there for a week. Due to these violations and Father's continued incarceration, DCS filed a petition for a temporary protective custody order, alleging that the child was dependent and neglected. The juvenile court entered an order on August 7, 2019, granting the request and placing the child in DCS custody. The Department then placed the child in the home of Lakysha B. ("Foster Mother"). In December 2019, the Davidson County Juvenile Court entered an order adjudicating Metric dependent and neglected.

The Department created five permanency plans between September 2019 and February 2022. Mother signed the criteria for termination in September 2019, and Father signed the criteria for termination in December 2021. After Mother and Father failed to comply with the requirements of the permanency plans, DCS filed a petition to terminate both parent's parental rights on June 2, 2022.

The trial court heard the matter on April 5, 2023. Before the hearing began, Father's counsel informed the court that he was unable to arrange Father's participation in the hearing due to Father's incarceration in Bledsoe County and the detention center's failure to respond to requests for transport to Davidson County. Father's counsel, DCS, and the guardian ad litem agreed to continue the matter as to Father to allow his counsel to arrange for him to participate in the hearing.

Mother also was not present when the hearing was scheduled to begin at 9:00 in the morning. Her counsel made a motion to continue the matter due to Mother's failure to appear. The court found that Mother had been properly served and received proper notice of the hearing and that Mother had previously appeared in court twice and requested an attorney be appointed to represent her at those times. The Department then made a motion to proceed in her absence. After several attempts to contact Mother, Mother's counsel finally reached her, and she informed her attorney that she had overslept and would take a ride-share service to get to the hearing. The court began the hearing in Mother's absence. After hearing the Department's proof, Mother's attorney renewed the motion to continue the hearing. However, when Mother still had not arrived by 1:15 in the afternoon, the court denied the motion to continue and proceeded with the hearing.

After the close of proof, the court entered an order terminating Mother's parental rights. In the order, the court found that the following grounds for termination had been proven by clear and convincing evidence: abandonment by failure to visit, abandonment by failure to support, substantial non-compliance with the permanency plans, persistence of conditions, and a failure to demonstrate an ability and willingness to assume custody of or financial responsibility for the child.

On July 6, 2023, the court held the hearing to terminate Father's parental rights. Father again was not present. At the start of the hearing, there was some discussion about Father's whereabouts. Father's attorney informed the court that, after telling Father that transport was being arranged for him to attend the hearing, Father stated that he was due to have a parole hearing and expected to be released. Father's counsel believed Father was transferred to the Nashville probation office sometime in the last week or two, but he had not received any contact from Father. Father's counsel claimed that he did not have any way to contact Father and made an oral motion to withdraw from representation due to Father's absence and counsel's inability to proceed without his guidance. A court officer then called for Father in the hall but received no answer. The court allowed Father's counsel to withdraw from representation, finding that Father had the opportunity to speak with his attorney prior to his expected release, that Father knew the date of the hearing, and that Father had received his attorney's contact information through letters the attorney had sent Father during his incarceration. After this ruling, the hearing proceeded.

At the conclusion of the hearing, the court entered an order terminating Father's parental rights. In the order, the court found that DCS had proven the following termination grounds by clear and convincing evidence: abandonment by failure to visit, abandonment by wanton disregard for the welfare of the child, substantial noncompliance with the permanency plans, persistence of conditions, and failure to manifest an ability and willingness to assume custody. The court also found that terminating Father's parental rights was in the child's best interest.

Mother and Father each appealed the respective orders terminating their parental rights, and this Court consolidated their appeals. Mother presents the following issues, which have been consolidated and restated, for our review: (1) whether the juvenile court erred in determining that grounds existed to terminate her parental rights, and (2) whether the juvenile court erred in determining that termination of her parental rights was in the child's best interest.

Father presents a single issue for our review: whether the juvenile court violated his due process right to a fundamentally fair proceeding by allowing his attorney to withdraw on the morning of trial.

STANDARD OF REVIEW

Parents have a fundamental constitutional interest in their child's care, custody, and control. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). Our Supreme Court has found that this interest is "'far more precious than any property right.'" *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). While this right is fundamental, it is not interminable, and parents may forfeit this right by abandoning the child or conducting themselves in ways which substantially harm their child. *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010). The Tennessee legislature has, therefore, established the methods by which parental rights may be terminated. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Under the statute, parents' rights may be terminated on clear and convincing evidence that at least one of the grounds found in the statute exists and that terminating the parent's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013). A reviewing court must determine on its own whether the facts, "either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524.

We review the trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); Tenn. R. App. P. 13(d). The evidence supporting both steps of the termination process must be proven by clear and convincing evidence, and the petitioner bears this burden. *In re Angela E.*, 303 S.W.3d at 250. This standard ensures that the facts are established as highly probable and produces in the fact-finder a firm belief about the truth of the facts. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

ANALYSIS

I.    Father's due process claim.

Father's sole issue on appeal concerns whether the juvenile court violated his due process right to a fundamentally fair proceeding by allowing his appointed counsel to withdraw. The United States Supreme Court has held that the Due Process Clause of the United States Constitution does not "require[ ] the appointment of counsel in every parental termination proceeding." *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 31 (1981). The State of Tennessee, however, "statutorily provides the right to appointed counsel for indigent parents in every parental termination proceeding." *In re Carrington H.*, 483 S.W.3d at 527 (citing Tenn. Code Ann. § 37-1-126(a)(2)(B)(ii)). Each trial court is under a mandatory duty to appoint counsel for indigent parents. Tenn. Code Ann. § 37-1-126(a)(3). A parent may implicitly waive this right to counsel if the parent fails "to assist his counsel or communicate with her at all in the two months before the [parental termination] hearing." *In re Elijah B.*, No. E2010-00387-COA-R3-PT, 2010 WL 5549229, at *6 (Tenn. Ct. App. Dec. 29, 2010). A parent's failure to cooperate with appointed counsel can also amount to an implicit waiver of the right to counsel. *In re M.E.*, No. M2003-00859-COA-R3-PT, 2004 WL 1838179, at *12 (Tenn. Ct. App. Aug. 16, 2004).

Once appointed by a court to represent an indigent parent, an attorney must seek leave of the court to withdraw. *In re Jamie B.*, No. M2016-01589-COA-R3-PT, 2017 WL 2829855, at *5 (Tenn. Ct. App. June 30, 2017) (citing TENN. SUP. CT. R. 13, Sec. 1(e)(5)). A trial court's decision regarding whether to grant or deny a motion to withdraw is within the court's discretion. *Id.* We review these decisions under an abuse of discretion standard. *Id.* "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

Courts must "consider the principles embodied in the [Tennessee] Rules of Professional Conduct" when deciding whether a parent has implicitly waived his or her right to appointed counsel and, therefore, whether to grant a motion to withdraw. *In re Jamie B.*, 2017 WL 2829855, at *5. Certain situations will permit an attorney to withdraw from representation under the Rules of Professional Conduct. *See* TENN. SUP. CT. R. 8, Rule 1.16(b). Among the situations that allow an attorney to withdraw are when "the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled" or when "the representation . . . has been rendered unreasonably difficult by the client." *Id.* Rule 1.16(b)(5), (6). A failure both to communicate and to appear at the hearing can render representation unreasonably difficult and serve as a basis for withdrawal of representation. *In re A.P.*, No. M2017-00289-COA-R3-PT, 2019 WL 1422927, at *5 (Tenn. Ct. App. Mar. 29, 2019).

In Father's case, the juvenile court allowed his counsel to withdraw because he failed to appear in court while having notice of the court date. Therefore, our task is to determine whether the record is sufficient to show that Father effectively waived his right to counsel and whether the juvenile court correctly permitted the withdrawal.

We begin our analysis with a discussion of the cases relied upon by the parties in support of their arguments. The Department insists this case is analogous to *In re Elijah B.*, 2010 WL 5549229. In that case, the father failed to appear at a termination hearing despite having notice of the hearing's date. *Id.* at *5. His attorney informed the court that she had not been able to contact the father for over a month and then orally made a motion to withdraw. *Id.* at *4. The court granted the motion and proceeded with the hearing, ultimately terminating the father's parental rights. *Id.* at *2. On appeal, we concluded that the withdrawal had not denied the father due process because he had notice of the hearing date and had attended a previous hearing, at which the termination hearing date was rescheduled. *Id.* at *5. We also noted that the father did not give any reason for his absence or lack of communication with his attorney. *Id.* at *6. We, therefore, concluded that the father had waived his right to appointed counsel. *Id.*

Father relies on three cases to support his argument that his due process right was violated. First, he relies on *In re Jamie B.*, 2017 WL 2829855, at *6. In that case, we determined that a mother's rights were violated based upon a finding that the record was insufficient to establish that the mother had waived her right to counsel. The court placed particular importance on the fact that "[t]he information provided by counsel regarding his efforts to communicate with his client was limited as was the court's questioning." *Id.* We also took issue with whether the mother's counsel had "provided suitable notice that he would withdraw if Mother failed to satisfy [her] obligations [to him]." *Id.* Second, Father relies on *In re A.P.*, 2019 WL 1422927, at *5, a case where we again found that a mother's rights were violated, noting that there was no evidence in the record to support the attorney's allegation that the mother had failed to communicate with her attorney.[1] In making its determination, the court noted the attorney's failure to warn the mother of his intention to withdraw from representation should she not appear and the trial court's failure to inquire about the client's knowledge of the risk of withdrawal. *Id.* at *6. Lastly, Father relies on *In re Tavarius M.*, No. M2020-00071-COA-R3-PT, 2020 WL 7479411, at *6 (Tenn. Ct. App. Dec. 18, 2020). In that case, we found a due process violation based on similar grounds noting that "it is not clear that Father W. simply chose not to appear on the first day of trial" and that the record contained no evidence to support the attorney's allegation that he could not communicate with the client. *Id.* We again expressed concern that the record did not contain anything to indicate "whether counsel 'provided [Father W.]

---

[1] *In re A.P.* is factually distinguishable from the present case in one respect. In that case, the mother insisted that she did not have notice of the hearing date, *In re A.P.*, 2019 WL 1422927, at *6; in the present case, Father has not disputed that he had notice of the hearing through his attorney.

any prior warning that he might withdraw.'" *Id.* (quoting *In re Jamie B.*, 2017 WL 2829855, at \*6).

We believe the circumstances of this case are more in line with those in cases cited by Father. First, there is no indication that Father's attorney had ever warned Father of his intent to withdraw should Father not appear. The juvenile court noted that, "Even if the attorney were able to send notice of a motion to withdraw, there would be nowhere to send it to." However, there is nothing in the record as to whether Father's attorney warned him of the attorney's intent to withdraw at the previous meeting between Father and his attorney. Next, similar to *In re Elijah B.*, Father did not appear despite having notice of the hearing date. However, unlike in that case, we cannot discern whether Father had an excuse for his absence because the record does not establish whether Father was actually released from incarceration. Father's attorney stated that Father "was having a parole hearing" and that "[Father] thought he would be getting out on parole for this date." Regarding whether counsel verified that Father was granted parole, Father's attorney stated that, "[i]t appears that he was transferred to the Nashville probation office sometime in the last week or two." Father's attorney then stated, "I think the date on it was June 27 . . . ." The court did not inquire what "it" was, and we cannot discern from the record to what Father's attorney was referring. The court similarly did not ask about the basis of counsel's statement, whether Father's attorney had contacted the Nashville probation office to request contact information for Father, or even whether counsel's assertion was factually accurate. The court stated that "his [Father's] attorney was aware that he possibly could make parole." Thus, the court did not confirm that Father had been released; we do not consider the court's inquiry to be sufficient in this context. Finally, even if we were to assume that Father was released on June 27, Father's counsel had been unable to contact Father for nine days, which is significantly shorter than the more than month-long period we found to be sufficient in *In re Elijah B.*, 2010 WL 5549229, at \*6.

Based on the foregoing, "it is not clear that Father . . . simply chose not to appear." *In re Tavarius M.*, 2020 WL 7479411, at \*6. The record does not contain sufficient evidence of Father's attorney's efforts to communicate with Father. The juvenile court failed to determine Father's incarceration status or whether Father's attorney had made adequate efforts to communicate with him. Under these circumstances, we cannot find that the record supports a finding that Father waived his right to counsel. Therefore, we vacate the judgment of the juvenile court as to Father's parental rights and remand the case for a new trial consistent with this opinion.[2] As Father's attorney was allowed to withdraw, on

---

[2] Because of this finding, we will not evaluate the court's conclusions regarding Father's parental rights. As we have previously stated:

> We are mindful of our supreme court's direction that we review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests. This serves to prevent "unnecessary remands of cases" and the important goal of speedily resolving parental termination cases. However, parents are also entitled to

remand, the court should make a new determination concerning Father's indigency and, if appropriate, appoint him counsel.

## II. Termination of Mother's parental rights

### a. Termination Grounds

#### i. Abandonment

A parent's rights may be terminated if he or she abandons his or her child. Tenn. Code Ann. § 36-1-113(g)(1). As relevant here, abandonment means the failure to visit, support, or make reasonable payments toward supporting the child during the four months before the filing of the petition to terminate the parent's rights. Tenn. Code Ann. § 36-1-102(1)(A)(i). This definition creates two grounds for termination: failure to visit and failure to support. The trial court found that Mother abandoned the child by failing to both visit and support the child. Because DCS filed the petition to terminate Mother's rights on June 2, 2022, the relevant four-month period for both of these grounds was February 1, 2022, to June 1, 2022. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb 20, 2014) (holding that the four-month time period for this purpose is "the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed").

#### 1. Failure to visit

In this context, "failed to visit" means that the parent, for four (4) consecutive months prior to the filing of the termination petition, failed to visit with the child or engage in more than token visitation. Tenn. Code Ann. § 36-1-102(1)(E). A parent engages in token visitation when "the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." *Id.* § 36-1-102(1)(C). Determining whether visitation is token requires considering the circumstances of the individual case and is a particularly fact-intensive inquiry that should be decided on a case-by-case basis. *In re Keri C.*, 384 S.W.3d 731, 748 (Tenn. Ct. App. 2010). In determining this question, courts examine the "frequency, duration, and quality of the visits that occurred." *Id.* at 750.

---

fundamentally fair procedures in termination proceedings. Given that we have determined Mother was denied these fundamentally fair procedures, we find it inappropriate to review findings based on evidence that went largely unchallenged by Mother and which was offered at a hearing during which Mother did not have the benefit of counsel. "[U]ltimate rights should be decided only when the court is 'in possession of the materials necessary to enable it to do full and complete justice between the parties.'"

*In re Jamie B.*, 2017 WL 2829855, at *7 (internal citations omitted).

Evidence in the record establishes that Mother had no in-person visits with the child during the relevant four-month period. Indeed, Foster Mother testified that Mother had not visited the child in person in years. Foster Mother acknowledged that Mother engaged in some video calls with the child during the relevant time period, but these calls were sporadic, and Mother often talked to Foster Mother more than to the child during the calls. Furthermore, the child did not know Mother's name and often asked Mother her name during the video calls. Based on this evidence, we cannot say these video visits were "helpful in developing any meaningful bond with the child." *In re William B.*, No. M2020-00187-COA-R3-PT, 2021 WL 4935740, at \*21 (Tenn. Ct. App. Oct. 22, 2021). Therefore, we agree with the juvenile court's finding that these visits amounted to nothing more than token visitation. We conclude that the juvenile court properly determined that this termination ground had been proven by clear and convincing evidence.

### 2. Failure to support

A parent fails to support his or her child when he or she fails "to provide monetary support or to provide more than token support payments towards the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is support that, "under the circumstances of the individual case, is insignificant given the parent's means." *Id.* § 36-1-102(1)(B). Mother knew of her legal duty to provide support for the child because of the numerous permanency plans that required Mother to support the child and the criteria for termination Mother signed in September 2019. Foster Mother testified that Mother worked periodically throughout the proceedings and had income. Nonetheless, Foster Mother testified that she never received any support payments from Mother.

Mother argues that DCS did not prove this ground by clear and convincing evidence because it did not prove she had the means and ability to provide support for the child. Though not a model of clarity, Mother's argument here seems to be that DCS failed to prove this ground because her failure to provide support was not willful. She has waived this argument, however, by not pleading it as an affirmative defense pursuant to Tenn. R. Civ. P. 8.03. *See* Tenn. Code Ann. § 36-1-102(1)(I); *see also In re Mitchell B.*, No. M2022-01285-COA-R3-PT, 2023 WL 3619561, at \*5 (Tenn. Ct. App. May 24, 2023) ("This Court held that omission results in waiver of lack of willfulness as an affirmative defense."). Similarly, Mother failed to present any evidence at trial from which the issue could have been tried by consent. *See In re Aliyah P.*, No. M2022-01645-COA-R3-PT, 2023 WL 6973858, at \*4 (Tenn. Ct. App. Oct. 23, 2023). Mother did not appear at trial and, therefore, could not testify about her income and expenses. Therefore, "the deficit in the evidence is the result of Mother's actions." *Id.* at \*5.

In light of the foregoing, we conclude that this ground for termination was proven by clear and convincing evidence.

b. Substantial Noncompliance with Permanency Plans

We turn next to the juvenile court's termination of Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2). This ground allows a parent's rights to be terminated when "there has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." *Id.*

Termination of parental rights based on this ground necessitates more than simply "a parent . . . not compl[ying] with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Instead, DCS must demonstrate both "that the requirements of the permanency plan are reasonable and related to remedying the condition that caused the child to be removed from the parent's custody" and "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not yet been met." *Id.* Requirements outlined in a permanency plan should be designed to address the problems that led to removal and, ultimately, to put the parents in a place where they may provide the child with a "safe, stable home and consistent care." *In re C.S., Jr.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). Parents must put meaningful effort into completing the permanency plan requirements in order to set themselves up to take responsibility for their children. *Id.*

Metric was removed from Mother's care due to Mother's drug use while pregnant with Metric and after his birth. Over several years, the court created five permanency plans, giving Mother the requirements needed to regain custody of Metric. These requirements can generally be placed into one of three categories: remedying drug and alcohol abuse, remedying trauma and mental health issues, and maintaining contact with the child and DCS. Of these, the first two categories are reasonably related to remedying Mother's persistent use of drugs, which led to Metric's removal. The third category is related to the reunification of Mother and Metric. We agree with the juvenile court's finding that the requirements in the plans are reasonable and related to the problems that necessitated Metric's removal.

We turn next to whether Mother's noncompliance with the permanency plans is substantial. To determine whether noncompliance is substantial, we measure both "the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). The juvenile court found that, while Mother had completed some assessments regarding parenting, substance abuse, and mental health, Mother had failed to complete the recommendations of these assessments or to implement any changes resulting from these assessments. The court also found that Mother had failed to maintain stable housing and was instead living with a "paramour with a criminal and drug history." Finally, the court found that Mother had failed to provide any support for the child or to visit with the child. Ultimately, the court concluded that Mother's conduct amounted to substantial noncompliance with the permanency plans.

Testimony given at trial establishes that Mother failed to comply in any meaningful way with the permanency plans' requirements. Mother did not attend the required drug and alcohol addiction meetings. While Mother did participate in two mental health intakes, she did not complete the required recommendation of ongoing therapy. Also, while Mother completed a drug and alcohol assessment, she similarly did not complete the recommendations of ongoing random drug screens. Mother entered four to five inpatient drug treatment programs during Metric's time in foster care, completing some of these but never maintaining sobriety. Mother failed to complete a parenting education course. Mother also failed to attain stable housing. She provided DCS with verification that she was entering a sober living and domestic abuse recovery program the day before trial. Prior to this, Mother lived with a boyfriend. Mother failed to provide proof of any sources of income to DCS or to maintain contact with DCS generally.

Most importantly, Mother failed to maintain her sobriety. This was the most significant reason for Metric's removal, and Mother failed to remedy her substance abuse. We, therefore, determine that the record contains clear and convincing evidence that Mother has not complied substantially with the requirements laid out in the permanency plans, and we affirm the court's conclusion that the Department has carried its burden of proof on this ground.

### c. Persistent Conditions

The trial court also terminated Mother's rights under Tenn. Code Ann. § 36-1-113(g)(3). This section provides that termination may be based on the following:

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and:
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Neither party disputes that the first two elements were satisfied. On August 7, 2019, DCS filed a motion for a temporary protective custody order that alleged the child was dependent and neglected. The juvenile court entered an order granting the motion and removing the child from Mother's custody on the same day—more than six months before the termination hearing in April 2023. Therefore, our analysis will focus on the remaining three requirements found in the statute.

Willfulness is not a requirement under this ground. *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *6 (Tenn. Ct. App. July 13, 2000). The continued inability to care for the child will constitute a condition preventing the child's return to the parent. *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008). The underlying purpose of this ground is to prevent a child from "lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008).

The condition necessitating removal was Mother's substance abuse issue. The evidence in the record shows that Mother failed to remedy this issue. Mother's substance abuse dates back to the child's birth, at which time she admitted to using cocaine three days before his birth. Within seven months, the Department received another report that Mother was smoking cocaine with Metric present. According to the report, Mother was so high that she forgot he was there. Mother failed to maintain sobriety after the removal, relapsing several times despite entering drug treatment programs four or five times. She also failed to participate in mandatory Alcoholics Anonymous or Narcotics Anonymous programs.

In addition to the persistence of the condition necessitating removal, other conditions exist that will likely cause the child to be further abused or neglected in a manner that prevents the child from being returned to the parent. Tenn. Code Ann. § 36-1-113(g)(3)(A)(i); *see also In re Daylan D.*, No M2020-01647-COA-R3-PT, 2021 WL 5183087, at *9 (Tenn. Ct. App. Nov. 9, 2021). Mother struggled to obtain and maintain stable income and housing throughout the custodial period. In particular, she failed to maintain steady employment, and Foster Mother testified that, after the child was placed in Foster Mother's home, Mother had five different romantic partners, all of whom had issues with substance abuse and physical abuse. Her struggles with romantic relationships also included fighting with one of her partner's girlfriends while Mother was pregnant with another child, which Mother reported caused her to miscarry.

Mother argues that her brief periods of sobriety and her entrance to another drug treatment program show that DCS failed to prove that there is little likelihood that the conditions that precipitated the child's removal will not be remedied at an early date. We respectfully disagree. "Where, as here, efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to

the parent in the near future is justified." *In re T.S.*, 2000 WL 964775, at *7. Although Mother completed a drug and alcohol assessment, she failed to follow the recommendations of the assessment. Furthermore, Mother completed a parenting assessment but failed to complete the recommendations from the assessment. The Department repeatedly offered Mother assistance, but she failed to take advantage of the programs provided. Mother points to her single negative drug test as evidence that she has made progress; she fails to note, that after this drug test, DCS was unable to test Mother again, and Mother entered a treatment facility.

The record shows that a continuing relationship with Mother will impede Metric's opportunity for integration into a safe, stable, and permanent home. Metric made significant progress in foster care, while Mother has not made progress during this time. Foster Mother also expressed her wish to adopt Metric if given the opportunity, giving Metric the opportunity to integrate into a safe, stable, and permanent home. We find that DCS proved this ground by clear and convincing evidence.

### d. Failure to Manifest an Ability and Willingness to Assume Custody

Finally, the trial court terminated Mother's rights based upon a finding that clear and convincing evidence existed that Mother had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for Metric. *See* Tenn. Code Ann. § 36-1-113(g)(14). To establish this termination ground, the petitioner must prove two elements by clear and convincing evidence: (1) that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody of or financial responsibility for the child; and (2) that placing the child in the parent's custody poses "'a risk of substantial harm to the physical or psychological welfare of the child.'" *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting Tenn. Code Ann. § 36-1-113 (g)(14)). Evidence that a parent has failed to manifest either an ability or willingness is sufficient to satisfy the first element. *Id.* at 677. When considering the second element, the risk of harm must be a "real hazard or danger that is not minor, trivial, or insignificant." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). The harm must also be "more than a theoretical possibility." *Id.* The harm does not need to be inevitable, but "it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Id.*

Mother argues that DCS failed to prove the first element by clear and convincing evidence because the record shows that she manifested a willingness to assume custody by telling her DCS caseworker that she wanted the child back. We respectfully disagree. Courts look at more than just a parent's words when considering whether willingness has been shown. *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). Instead, willingness is shown "by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn.

Ct. App. Mar. 22, 2019). As to ability to assume custody, "[a]bility focuses on the parent's lifestyle and circumstances." *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). Looking beyond Mother's words, we conclude that she failed to manifest an ability or a willingness to assume custody of Metric. She failed to remedy her drug issues and failed to maintain stable housing or income. She failed to consistently maintain contact with DCS or Metric, and she failed to comply with the requirements of the permanency plans or to take advantage of programs offered to her. Mother told Foster Mother at least four times that she wanted to surrender Metric, told Foster Mother before trial that she would be unable to care for two children, and that she did not know Metric anymore.

Turning to the second element of the statute, we conclude that placing Metric in Mother's custody would pose a risk of substantial harm to his physical and psychological welfare. A recent opinion from this court contains a list of illustrative situations in which harm may be found, all of which appear present in this case:

> By way of illustration, forcing a child to begin visitation with a near-stranger would make psychological harm sufficiently probable. Or placing a child with a parent who engaged in repeated criminal conduct that required incarceration would put a child at risk of substantial physical or psychological harm. And parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence could lead to a conclusion of a risk of substantial harm.

*In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) (internal citations omitted) (collecting cases). All of the above situations are present in this case. At the time of trial, Mother was a near-stranger to Metric. She continued to engage in criminal activity by purchasing and using illegal drugs. Mother also had issues with domestic violence. All of these conditions combine to show that placing Metric in Mother's care would pose a risk of substantial harm to him. We, therefore, conclude that this termination ground was proven by clear and convincing evidence.

Having found at least one ground for termination, we now turn to whether the termination of Mother's parental rights is in the child's best interest.

III.     Best interest analysis

The best interest analysis is distinctly separate from and subsequent to the determination of whether grounds sufficient to terminate parent rights can be proven by clear and convincing evidence. *In re Angela E.*, 303 S.W.3d at 254. Once a parent has been found unfit by clear and convincing evidence of a ground for termination, the interests of the parent and the child diverge, and courts focus on the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. The facts a court considers when undertaking a best interest analysis

- 14 -

must be proven by a preponderance of the evidence. *Id.* at 861. The court must first make underlying factual determinations; then, the court should consider whether "the combined weight of these facts" is sufficient to show clear and convincing evidence that termination is in the best interests of the child. *Id.*

Courts are required to consider a non-exhaustive list of factors when deciding whether termination is in the child's best interest. *See* Tenn. Code Ann. § 36-1-113(i); *In re Dakota C.R.*, 404 S.W.3d 484, 503 (Tenn. Ct. App. 2012). Courts are not required to find the existence of each factor before concluding that termination is in the child's best interest. *Id.* Instead, "the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 877). Even if one factor is determinative, the court has a duty to consider all factors and relevant proof that a party offers. *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017). The best interest of the child is evaluated from the child's perspective, not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). When the parent's and child's interests conflict, the conflict is always to be resolved to favor "the rights and the best interests of the child." Tenn Code Ann. § 36-1-101(d).

Whether termination is in the child's best interests requires more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. Instead, the "the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case." *In re Gabriella D.*, 531 S.W.3d at 682. The best interests analysis must be a "factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated." *Id.*

The first statutory factor directs courts to consider "[t]he effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority." Tenn Code Ann. § 36-1-113(i)(1)(A). Termination of Mother's parental rights will have a positive effect on the child's need for stability and continuity of placement. The child has been in the same foster home for nearly four years. He is bonded to Foster Mother and calls her "mom," and Foster Mother wants to adopt the child one day. *See id.* § 36-1-113(i)(1)(H) ("Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent."). The child has formed bonds with the other foster children in Foster Mother's home and has bonded to Foster Mother's partner. *See id.* § 36-1-113(i)(1)(I) ("Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage."). Placing the child in Mother's home would have a negative effect on his emotional and psychological condition because of his bond with Foster Mother and his complete lack of a relationship with Mother. *See id.* § 36-1-113(i)(1)(B) ("The effect a change of caretakers

and physical environment is likely to have on the child's emotional, psychological, and medical condition.").

In contrast, Mother has not demonstrated continuity or stability in meeting Metric's needs. At the time of trial, Mother was entering another treatment program for her ongoing substance abuse issues. She also could not prove that she had attained stable housing. *See id.* § 36-1-113(i)(1)(C) ("Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs."). She failed to maintain consistent visitation and told Foster Mother that she does not really know the child. The child reciprocated this feeling, often asking Foster Mother who Mother was before the few calls he had with Mother. Mother also told Foster Mother that she could not afford to take care of two children and that she wished to surrender her rights to the child. This evidence establishes that Mother does not have a significant attachment with the child, and there is no basis for a reasonable expectation that Mother can create one. *See id.* § 36-1-113(i)(1)(D), (E) ("Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment" and "[w]hether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child."). Mother has never provided a safe and stable environment to care for the child, and nothing suggests that Mother has the ability or commitment to creating a safe and stable environment for the child. *See id.* § 36-1-113(i)(1)(O), (P), (Q) ("Whether the parent has ever provided safe and stable care for the child or any other child," "[w]hether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive," and "[w]hether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs.").

Mother's physical environment is unhealthy and unsafe for the child because Mother failed to maintain stable and safe housing. She lived with boyfriends in situations that regularly included domestic violence. *See id.* § 36-1-113(i)(1)(R) ("Whether the physical environment of the parent's home is healthy and safe for the child."). Mother demonstrated that she lacked the mental or emotional fitness to care for the child by failing to complete the required therapy sessions or to implement the recommendations from these sessions. Mother also failed to pay any child support during the child's time in foster care. *See id.* § 36-1-113(i)(1)(S), (T) ("Whether the parent has consistently provided more than token financial support for the child," and "[w]hether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.").

Regarding factors (J), (K), (L), and (M), Mother did not take advantage of available programs or make a lasting adjustment of her circumstances and did not demonstrate a sense of urgency in addressing the circumstances that led to the child's removal, despite DCS's reasonable efforts. The Department made reasonable efforts to help Mother regain

custody of the child. These efforts included creating permanency plans for Mother specifying what she needed to do to regain custody and providing Mother with numerous drug and alcohol assessments that included recommendations for Mother to remedy her substance abuse and mental health problems. Mother failed to complete the tasks on the permanency plans or to carry out the assessments' recommendations. In this way, Mother failed to take advantage of the services offered by DCS. Mother's substance abuse issues persisted throughout the child's time in DCS's custody, and she repeatedly engaged in criminal conduct. Mother failed to show any sense of urgency in remedying the issues that necessitated the child's removal. *See id.* § 36-1-113(i)(1)(J), (K), (L), and (M) ("Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner," "[w]hether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions," "[w]hether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department," and "[w]hether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest.").

The remaining factors do not weigh in favor of or against termination. Based on the combined weight of the individual facts in this case, we find that clear and convincing evidence exists that termination of Mother's parental rights is in the child's best interests.

CONCLUSION

The judgment of the trial court is vacated and remanded in part and affirmed in part. Costs of this appeal are assessed equally against the appellant, Larisha R., and the appellee, Tennessee Department of Children's Services, for which execution may issue if necessary.


/s/ Andy D. Bennett_____
ANDY D. BENNETT, JUDGE